**HEADNOTE**: Consolidated Cases: No. 1168, September Term 2017, *Steamfitters Local Union No. 602 v. Erie Insurance Exchange, et al.,* and No. 1142, September Term 2017, *Steamfitters Local Union No. 602 v. Cincinnati Insurance Company, et al.*

_____

## TORTS – NEGLIGENCE AS TO PREMISES AFFECTING ADJOINING LAND

These consolidated cases arose out of a fire alleged to have originated in a mulched strip of land on the property of Steamfitters Local Union No. 602 ("Steamfitters") that caused substantial damage to the real and personal property of neighboring property owners. The plaintiffs proceeded on the theory that the fire was started by a cigarette carelessly discarded into the mulch by an unknown person, perhaps an apprentice waiting for class to begin at a school operated on Steamfitters' property by the Heating, Piping and Refrigeration Training Fund ("Training Fund"). Various insurance companies that paid claims filed by the neighboring property owners for damages caused by the fire, proceeded as subrogees of their insureds. Steamfitters sought contractual and common law indemnification and contribution from the Training Fund.

Both Steamfitters and the Training Fund filed motions for summary judgment. The circuit court denied Steamfitters' motion for summary judgment and granted summary judgment in favor of the Training Fund. After a trial, the jury returned verdicts in favor of the plaintiffs. Damages in excess of $1.3 million, most of which were stipulated, were awarded to the plaintiffs.

**HELD:** A property owner owes a duty of reasonable care to the owners and occupants of neighboring properties to use and maintain his or her property in a reasonably safe manner so as to avoid harm to the neighboring property. Where the particular use or condition of the premises is not inherently or unusually dangerous, the issue of whether the duty of reasonable care has been breached is a question for the factfinder when there is evidence that the use or condition is dangerous because of a practice or pattern of behavior by persons on the premises and the owner knew or reasonably should have known that a dangerous use or condition existed.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

Nos. 1168 and 1142
September Term, 2017

_____

CONSOLIDATED CASES

_____

No. 1168
STEAMFITTERS LOCAL UNION NO. 602
v.
ERIE INSURANCE EXCHANGE, ET AL.

_____

No. 1142
STEAMFITTERS LOCAL UNION NO. 602
v.
CINCINNATI INSURANCE CO., ET AL.

_____

Berger,
Friedman,
Eyler, James, R.
  (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Eyler, James R., J.
Dissenting Opinion by Friedman, J.

_____

Filed: May 30, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

The litigation that resulted in these consolidated appeals commenced on December 14, 2015, when Gordon Contractors, Inc. ("Gordon") and its insurers, Erie Insurance Exchange ("Erie") and Continental Casualty Company ("Continental"), appellees, filed a complaint in the Circuit Court for Prince George's County, Case No. CAL 15-38293, against Steamfitters Local Union No. 602 ("Steamfitters"), appellant. Gordon, Erie, and Continental alleged that on or about April 6, 2015, a fire that originated in a mulched strip of land on Steamfitters' property caused damage to real and personal property on Gordon's adjacent storage yard. Steamfitters filed a third party complaint against the Heating, Piping and Refrigeration Training Fund ("Training Fund"), seeking contractual indemnification pursuant to an agreement for the use of space, common law indemnification, and contribution.

A second action was commenced on March 4, 2016, when Cincinnati Insurance Company ("Cincinnati") filed a complaint in the Circuit Court for Prince George's County, Case No. CAL 16-07205, as the subrogee of Falco Industries, Inc., C&M Properties, LLC, C&M Properties Delaware, LLC, and Garage Center, LLC (referred to collectively as "Falco"). Cincinnati alleged that the April 6, 2015 fire that started in the mulched strip of land on Steamfitters' property, spread to Falco's property and caused substantial damage to real and personal property. Steamfitters filed a third party complaint against the Training Fund in that case as well.

In April 2016, the two cases were consolidated. For ease of reference, we shall refer to Gordon, Erie, Continental, and Cincinnati collectively as either the plaintiffs or appellees.

Steamfitters and the Training Fund filed motions for summary judgment. After a hearing, the court denied Steamfitters' motion for summary judgment and granted summary judgment in favor of the Training Fund. The cases against Steamfitters were tried before a jury from July 17 to 20, 2017. The jury returned verdicts in favor of the plaintiffs. Damages were awarded in favor of Erie a/s/o Gordon in the amount of $1,039,176.67; in favor of Gordon, individually, in the amount of $111,125.38; in favor of Continental a/s/o Gordon in the amount of $72,338.48; and in favor of Cincinnati a/s/o Falco in the amount of $119,909.10.[1] This timely appeal followed.

## QUESTIONS PRESENTED

Appellant presents the following questions for our consideration:

I. Do commercial landowners owe their commercial neighbors a duty of care to prevent third parties, with whom they have no special relationship or vicarious responsibility, from discarding cigarettes in mulch based solely on notice of prior smoking activities on the property as evidenced by old cigarette butts?

II. In asserting that a commercial landowner violated a duty of care to prevent third parties from discarding cigarettes in mulch does a Plaintiff need to provide the fact finder with expert testimony as to reasonable, standard and effective measures to prevent same?

---

[1] At trial, the parties stipulated to the amount of damages for Cincinnati, Continental, and Gordon, individually. The only damages contested at trial were those for Erie a/s/o Gordon.

2

III.  Was Defendant prejudiced by the circuit court's charging the jury with a spoliation instruction where the only evidence of such spoliated evidence's existence is testimony that the party requesting such instruction referred to the evidence as useless and declined to copy same and where a request to hold evidence which specifically identified persons present at the time of the occurrence was later received and further, where the evidence was only "unbelievably close" to the area of interest and did not directly show same?

IV.  Was it proper for the circuit court to enter summary judgment on an indemnity agreement as it did not expressly call for one party to indemnify another for its own negligence where the contention was that the negligence was that of third parties whose activities were related to the indemnitor and where there were questions of fact as to how the parties acted after a term of years specified in the contract expired?

In addition, appellees request that the appeal be dismissed because Steamfitters failed to include certain agreed-upon items in the joint record extract in violation of Md. Rule 8-501.  Alternatively, they request that Steamfitters be ordered to pay the costs incurred in preparing an appendix.

For the reasons set forth below, we shall deny the motion to dismiss, affirm the circuit court's judgments, and order that the costs to be paid by appellant pursuant to our mandate include those costs incurred by appellees in preparing the appendix.

## FACTUAL BACKGROUND

At all times relevant to the instant case, Gordon was the owner of a storage yard, located at 8722 Ashwood Drive in Capitol Heights, that it used to store materials for its construction business.  Falco occupied a commercial warehouse that was adjacent to one side of Gordon's property and Steamfitters owned property adjacent to the other side. Gordon and Steamfitters' properties were separated by a chain link fence with security

3

slats. On Steamfitters' side of the fence, there was a strip of land covered with mulch, a parking lot abutting it, and a building used as a union hall. The Training Fund operated an apprentice school in the union hall pursuant to a written agreement with Steamfitters for the use of space.

Gordon and Falco alleged that the April 6, 2015 fire started when an unknown person discarded a lit cigarette into the mulch bed on Steamfitters' side of the fence. Gordon and Falco did not allege that Steamfitters was vicariously liable or that it had a duty to control the unknown person, but proceeded instead on the theory that Steamfitters, as the property owner, failed to use reasonable care to prevent the foreseeable risk of fire spreading to neighboring properties.

Steamfitters' business manager and corporate designee, Daniel Loveless, explained that, generally, most of the apprentices went directly from their jobs to the Training Fund's apprentice school and arrived between 2:30 and 5 p.m. Over time, he observed that, prior to the start of classes, apprentices napped, gossiped, minded their own business, and/or drank beer. Mr. Loveless was responsible for property maintenance. Although no employee was specifically assigned the task of cleaning up trash along the fence line between Steamfitters and Gordon's properties, Mr. Loveless had done so 2 to 3 times prior to the fire. According to Mr. Loveless, the mulch had not been replaced in a while, and the ground was bare in spots. Mr. Loveless was not sure if he had seen cigarette butts in the mulch prior to the fire, but after the fire, he did observe cigarette butts in the mulch. He acknowledged that there were more butts "than there should have been," and that, "[i]n the right situation," a carelessly discarded cigarette could start a

4

fire. He was "pretty sure" that Steamfitters did not have a smoking policy and that smoking was allowed outside of the union building. It was undisputed that Steamfitters did not issue any guidelines, communications, policies, or recommendations regarding smoking and that there were no signs prohibiting smoking on Steamfitters' property.

John Mastripolito, a corporate representative of Steamfitters, walked through the mulched area 8 times between February 2015 and the date of the fire. He testified that he did not see any cigarette butts in the mulch, but acknowledged that he had bad vision, wore glasses, and would not be concerned even if there were 100 cigarette butts in the mulch because he was "just not into cigarette butts[.]"

Wayne Crosby, an acting lieutenant and fire investigator assigned to the Prince George's County Fire Marshal's Office, was the lead investigator for the fire. He testified as an expert in fire origin, cause, growth, and spread. Lieutenant Crosby concluded that the fire originated along the fence line between the Steamfitters and Gordon properties and that constant wind on the day of the fire, with gusts up to 40 miles per hour, kept the fire low and pushed it down the fence line toward a dumpster, where it grew. He opined that embers from the mulch were blown by the wind into Gordon's construction yard where they ignited combustible foam insulation and caused the fire to grow. The foam insulation liquified and ran down the parking lot to one side of the Falco property, burning two fire trucks along the way.

According to Lieutenant Crosby, the only possible ignition source was a cigarette. A very large number of cigarette butts were found in the mulch on Steamfitters' side of the fence, and Lieutenant Crosby opined that the fire started when someone flicked a

5

cigarette into the mulch near the fence or when the wind blew a cigarette butt up against the fence. He acknowledged that the combustible foam insulation on Gordon's property was stored too close to the fence line, in violation of certain code provisions, but concluded that because of the strong winds, it did not matter where that material was stored.

Vehicles parked on Gordon's lot sustained damage in the fire. Lieutenant Crosby noted that the vehicles were burned from left to right and that there was no damage on one side of them. If the fire had started in one of the vehicles, it would have been totally consumed. As a result, Lieutenant Crosby ruled out the possibility that the fire started in one of those vehicles.

In reaching that conclusion, Lieutenant Crosby reviewed a videotaped interview of Richard Grasso, who had been teaching an apprentice class at the time the fire was discovered. Mr. Grasso said that a student told him there was a fire in the parking lot. Mr. Grasso went outside, saw flames and heavy black smoke, went back inside, and told everyone to move their vehicles. In both his recorded interview and a written statement, Mr. Grasso stated that he walked across the parking lot, looked over the fence, and saw a vehicle on Gordon's property that had smoke coming out from under its hood. In a later interview, Mr. Grasso stated that he saw the fence line on fire.

There were surveillance cameras on the Falco property, on the exterior of a church across the street from Steamfitters' property, and on the exterior of Steamfitters' building. Lieutenant Crosby obtained and reviewed video recordings from the Falco property and the church and requested, but did not receive, the video recording from Steamfitters'

6

building. Neither of the videos showed Mr. Grasso, or any other person, walk across the parking lot and look over the fence at the vehicles parked on Gordon's property. The video from the church showed "a lot of white smoke . . . burning for a long time[,]" which supported Lieutenant Crosby's conclusion that the fire started at the fence line.

Lieutenant Crosby collected a sample of the mulch and conducted a burn test which demonstrated that a cigarette butt could start a mulch fire under wind conditions similar to those that existed on the day of the fire. The video recording of the burn test was played for the jury.

Gordon's operations manager, Dale Wauters, was familiar with Gordon's construction yard and three trucks that were burned in the fire. Mr. Wauters was responsible for taking a monthly inventory of items on the construction lot and he inspected the lot a couple of times per week. He testified that Gordon had stacks of foam insulation, about 4 feet wide and 8 feet tall and long, stored approximately 3 to 4 feet from the fence, and that the insulation packaging included a warning that the product was combustible. He described a slope of about 4 feet from the base of the fence to the flat yard on Gordon's property and acknowledged that it was feasible for Gordon to store the insulation 15 feet away from the fence. There were pine trees on the mulched strip of land between Gordon and Steamfitters' properties. According to Mr. Wauters, the wind blew pine needles 20 to 30 feet into Gordon's construction yard.

Bruce Berlin, Gordon's Chief Financial Officer, testified that, prior to the fire, he was not familiar with any code provision requiring the foam insulation to be stored a certain distance from the property line. He stated that the insulation was closer to the

7

fence near the parked vehicles, but as the slope between the two properties became steeper, the insulation was stacked farther away from the fence. Mr. Berlin described the damage Gordon incurred as a result of the fire including the destruction of a structure, 3 destroyed vehicles and a tow trailer, damaged containers, hazardous material clean-up, and the loss of inventory. He also testified that Gordon's lot was not scraped or cleaned until sometime between June and October 2015, when a company provided hazardous waste removal. The parties stipulated that Erie paid Gordon $1,039,176.67 for its property damage.

Erie hired fire investigator Michael Schaal, to investigate the origin and cause of the fire. At trial, he was admitted as an expert in fire origin, cause, growth, and spread. During his investigation, Mr. Schaal observed "[h]undreds and hundreds, if not thousands of cigarettes" in the mulched area on Steamfitters' side of the fence. Although the mulch, pine needles, and cigarette butts were all combustible materials, Mr. Schaal stated that the most significant factor in the fire was the wind. On the day of the fire, the wind was blowing from the southeast across Gordon's lot and the fire burned in that direction. Mr. Schaal specifically noted that fire does not burn against the wind. According to Mr. Schaal, burning mulch, leaves, and pine needles could have been carried by the wind and ignited combustibles "farther down the line." The location of the foam insulation on Gordon's construction lot had no effect on the cause of the fire and, because of the wind speed and direction, would have burned regardless of whether it was stored 4 feet or 20 feet from the fence. Mr. Schaal stated that the wind was blowing "20 or 22 knots" and

8

the fire "spread across the parking lot very, very rapidly." By the time the fire department arrived, the fire "was well-involved."

Mr. Schaal rejected the idea that the fire originated in a vehicle on Gordon's lot because if it had, the fire would have had to burn back against the wind to cause the damage that was observed at the ground level along the fence line. In the video from the church, Mr. Schaal observed white smoke drift across the parking lot for 23 minutes and then instantly turn black. He opined that the white smoke was caused by "the mulch and pine straw burning along the fence line" and that the heavy black smoke that was later observed was caused by the burning of the insulation. He did not observe fire in the cab of any vehicle on Gordon's lot, which would be expected if the fire originated in a vehicle. Mr. Schaal rejected the idea that the burn pattern along the base of the fence was caused by burning foam insulation and not burning mulch. He concluded that the fire spread from Steamfitters' side of the fence to Gordon's lot because the wind picked up embers and spread them to Gordon's lot or because the fire spread through the base of the chain link fence. In either event, the origin of the fire was on Steamfitters' side of the fence.

Several photographs of the mulched area taken after the fire were introduced into evidence. The photographs depicted a large number of cigarette butts in varying condition. Appellees argued that one could infer that the butts had been deposited over a long period of time.

The defense presented testimony from fire investigator Richard Thomas Long, Jr., an engineer employed by Exponent, Inc., who was accepted as an expert in fire origin,

9

cause, and spread. Mr. Long first visited the site of the fire on May 11, 2015, when he was invited to attend a joint-party investigation. Later, in October 2015, he inspected the vehicles that were burned in the fire. As part of his investigation, Mr. Long reviewed aerial and historic images of the property, weather data, surveillance and cell phone videos, and the Prince George's County Code. He hypothesized that the fire originated in the mulch on Steamfitters' side of the fence. Mulch fires, however, are "very low intensity fire[s]," that would not produce six-foot-tall flames. According to Mr. Long, the burn patterns on the fence and north of the dumpster, were too tall to have been caused by a mulch fire. He opined that the burn patterns on the fence were caused by the burning foam insulation that hit the fence and discolored it.

Mr. Long testified that there were no pine needles, mulch, or other "thick, porous debris" more than 5 to 6 feet into Gordon's construction lot, there was no evidence that the fire spread 15 feet into Gordon's construction lot, and if the fire had come through the fence, it would have spread only 5 to 6 feet before encountering gravel which "doesn't burn." He maintained that the foam insulation, which was "highly combustible," was too close to the fence, which made it easier for it to ignite if the wind pushed the mulch fire through the fence.

On cross-examination, Mr. Long acknowledged that initially he had developed two possible theories about the cause of the fire. The first was, as he testified at trial, that the foam insulation boards were too close to the fence and that they ignited when the fire was pushed through the fence. His second theory was that the fire started in a Ford F-250 truck that was parked on Gordon's lot. That theory was based, in part, on the testimony

10

of Mr. Grasso who, as we have already noted, claimed that when he looked over the fence, he saw fire near the parked vehicles. Mr. Long acknowledged that if Mr. Grasso's testimony was determined to be untruthful, he would have to eliminate the vehicle as a possible cause of the fire. At Mr. Long's deposition, counsel for Gordon and its insurers pointed out that Mr. Grasso did not appear in any video looking over the fence, a fact that Mr. Long had not previously noticed. Thereafter, Mr. Long abandoned his opinion that the fire started in a vehicle parked on Gordon's construction lot. At trial, Mr. Long acknowledged that, in his deposition, he opined that the burn patterns on the base of the fence, where Lieutenant Crosby and Mr. Schaal placed the origin of the fire, were caused by melting foam insulation that pooled in that area. When asked how the melted insulation flowed up hill, Mr. Long stated that there was not really a change in elevation at that point.

The evidence relating to the storage of insulation was relevant to the defense of contributory negligence. The jury rejected that defense.

We shall include additional facts as necessary in our discussion of the issues presented.

## MOTION TO DISMISS THE APPEAL

As a preliminary matter, we address a motion to dismiss the appeal filed by Gordon, Erie, and Continental, and adopted by Cincinnati. Those appellees argue that dismissal is warranted because, without explanation, Steamfitters failed to comply with

11

Maryland Rule 8-501[2], which requires the appellant to bear responsibility for creating a

record extract.  Specifically, they contend that Steamfitters failed to include in the joint

---

[2] Maryland Rule 8-501 provides, in relevant part, as follows:

      (a) **Duty of appellant**.  Unless otherwise ordered by the appellate court or provided by this Rule, the appellant shall prepare and file a record extract . . . in every case in the Court of Special Appeals.  The record extract shall be included as an attachment to appellant's brief, or filed as a separate volume with the brief in the number of copies required by Rule 8-502(c).

*     *     *

      (c) **Contents.**  The record extract shall contain all parts of the record that are reasonably necessary for the determination of the questions presented by the appeal and any cross-appeal.  It shall include the circuit court docket entries, the judgment appealed from, and such other parts of the record as are designated by the parties pursuant to section (d) of this Rule.

*     *     *

      (d) **Designation by parties.**  Whenever possible, the parties shall agree on the parts of the record to be included in the record extract.  If the parties are unable to agree:
      (1) Within 15 days after the filing of the record in the appellate court, the appellant shall serve on the appellee a statement of those parts of the record that the appellant proposes to include in the record extract.
      (2) Within ten days thereafter, the appellee shall serve on the appellant a statement of any additional parts of the record that the appellee desires to be included in the record extract.
      (3) Within five days thereafter, the appellant shall serve on the appellee a statement of any additional parts of the record that the appellant proposes to include in view of the parts of the record designated by the appellee.
      (4) If the appellant determines that a part of the record designated by the appellee is not material to the questions presented, the appellant may demand from appellee advance payment of the estimated cost of reproducing that part.  Unless the appellee pays for or secures that cost within five days after receiving the appellant's demand, the appellant may

record extract certain trial exhibits that, ultimately, were included in an appendix to the

brief filed on behalf of Gordon, Erie, and Continental. Alternatively, Gordon, Erie, and

Continental seek reimbursement for the cost of preparing the appendix that was attached

to their brief.

Maryland Rule 8-501 clearly requires the parties to cooperate in the preparation of

the record extract and sets forth the procedure to be used when the parties cannot agree

on what should be included.  The rules of appellate procedure "'are "precise rubrics"

established to promote the orderly and efficient administration of justice, and thus are to

be strictly followed.'" *Lisy Corp. v. McCormick & Co., Inc.*, 445 Md. 213, 224

(2015)(quoting *Duckett v. Riley*, 428 Md. 471, 477 (2012)).  Sanctions for violations of

Md. Rule 8-501(c) are discretionary. Md. Rule 8-501(m); *Tannehill v. Tannehill*, 88 Md.

App. 4, 10 (1991); *In re Joshua W.*, 94 Md. App. 486, 491 (1993).  We have observed

that dismissal of an appeal for an appellant's violation of the rules is "a 'drastic

corrective' measure." *Rollins v. Capital Plaza Assocs. L.P.*, 181 Md. App. 188, 202

---

omit that part from the record extract but shall state in the record extract the reason for the omission.

(e) **Appendix in appellee's brief.**  If the record extract does not contain a part of the record that the appellee believes is material, the appellee may reproduce that part of the record as an appendix to the appellee's brief together with a statement of the reasons for the additional part.  The cost of producing the appendix may be withheld or divided under section (b) of Rule 8-607.

\* \* \*

(m) **Sanctions for noncompliance.**  Ordinarily, an appeal will not be dismissed for failure to file a record extract in compliance with this Rule. . . .

13

(2008)(quoting *Brown v. Fraley*, 222 Md. 480, 483 (1960)).  Reaching a decision on the merits of a case "is always a preferred alternative," and we will not ordinarily dismiss an appeal "in the absence of prejudice to appellee or a deliberate violation of the rule." *Joseph v. Bozzuto Mgmt. Co.*, 173 Md. App. 305, 348 (2007).

In the case at hand, appellant prepared a joint record extract, but failed to include certain exhibits requested by counsel for Erie.  There is no evidence to suggest that Steamfitters' failure to include the exhibits was purposeful.  Nevertheless, appellees Gordon, Erie, and Continental, who filed a joint brief, bore the expense of preparing an appendix containing the exhibits that were excluded from the record extract.  Aside from that additional expense, there is no indication that the parties were prejudiced as a result of Steamfitters' failure to include the exhibits in the record extract.  For that reason, we shall deny the motion to dismiss the appeal, but note that the costs to be paid by appellant pursuant to our mandate shall include those costs incurred by Gordon, Erie, and/or Continental in preparing the appendix to their brief.

## DISCUSSION

### I.

Steamfitters contends that the trial court erred in denying its motion for judgment because commercial landowners do not owe commercial neighbors a duty of care to prevent third parties, with whom they have no special relationship or vicarious responsibility, from discarding cigarettes in mulch based solely on notice of prior smoking activities on the property as evidenced by old cigarette butts. According to Steamfitters, it did not violate a rule or statute, there was nothing dangerous or illegal

14

about the condition of its property, and it had no special relationship with its commercial neighbors that would establish a duty to protect them from the acts of a third party. Steamfitters maintains that a discarded cigarette is not a condition of real property and that there was "nothing special about the mulch at issue," as it was not placed or stored in an unreasonable manner and is a commonly used product.

Steamfitters argues that, although foreseeability of harm is a factor in determining whether a duty of care exists, it is not, by itself, sufficient to establish a duty of care. Specifically, with regard to the condition of its property, Steamfitters argues:

> There was nothing about the condition of the property that was dangerous or illegal. Prior to the fire, the subject property contained mulch next to a fence. The mulch allegedly contained cigarette butts of indeterminate age. Those cigarette butts were not dangerous or illegal. They had been smoked and spent. For any danger to exist a third party had to commit an action and discard a cigarette. Plaintiffs, as mere neighbors with Steamfitters, were owed no duty of care by Steamfitters to protect Plaintiff from the torts of third persons. The relationship between commercial neighbors (if any) cannot and does not create any sort of special relationship.

Appellees counter that, under Maryland law, a property owner owes a common law duty to the owners and occupants of a neighboring property to use reasonable care when conducting activities on its property so as to avoid harm to the neighboring property. Based on the evidence presented at trial, a reasonable jury could conclude that Steamfitters knew or should have known that someone or some group of people on its property was regularly discarding lit cigarettes in the mulch bed that it placed against the fence adjacent to Gordon's property. Despite its knowledge, Steamfitters took no action to prevent the foreseeable risk that a fire might start and spread to adjoining properties.

15

Under the particular facts of this case, appellees are correct.

## A. Standard of Review Regarding Duty of Care

In considering a trial court's decision to deny a motion for judgment, we apply the following standard of review:

> We review a trial court's decision to grant or deny a motion for judgment applying the *de novo* standard of review. *DeMuth v. Strong*, 205 Md. App. 521, 547 (2012). "In the trial of a civil action if, from the evidence adduced that is most favorable to the plaintiff, a reasonable finder of fact could find the essential elements of the cause of action by a preponderance standard, the issue is for the jury to decide, and a motion for judgment should not be granted." *Id.* (citation omitted).

*Wallace & Gale Asbestos Settlement Trust v. Busch*, 238 Md. App. 695, 705, *cert. granted*, 462 Md. 84 (2018). We perform the same task as the trial court, affirming the denial of the motion for judgment "if there is 'any evidence, no matter how slight, that is legally sufficient to generate a jury question.'" *C&M Builders v. Strub*, 420 Md. 268, 291 (2011)(citations omitted).

## B. Duty of Care

In a negligence action, a plaintiff bears the burden of proving: "1) that the defendant was under a duty to protect the plaintiff from injury, 2) that the defendant breached that duty, 3) that the plaintiff suffered actual injury or loss, and 4) that the loss or injury proximately resulted from the defendant's breach of duty." *Rowhouses, Inc. v. Smith*, 446 Md. 611, 631 (2016)(quoting *Hamilton v. Kirson*, 439 Md. 501, 522 (2014)). Whether a duty of care exists is a pure question of law for the circuit court to decide in

16

the first instance, and for us to review *de novo*. *Todd v. Mass Transit Admin.*, 373 Md. 149, 155 (2003)(citing *Valentine v. On Target, Inc.*¸ 353 Md. 544, 549 (1999)).

As we recently noted in *Landaverde v. Navarro*, Maryland has adopted the characterization of "duty" set forth in W. Page Keeton, *et al.*, *Prosser and Keeton on the Law of Torts*, § 53, at 356 (5th ed. 1984), as "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *Landaverde v. Navarro*, 238 Md. App. 224, 248 (2018). *See also Blondell v. Littlepage*, 413 Md. 96, 120 (2010)(quoting W. Page Keeton, *et al.*). There is no universal test for determining whether a duty exists. *Jacques v. First Nat. Bank of Maryland*, 307 Md. 527, 533 (1986); *Ashburn v. Anne Arundel County*, 306 Md. 617, 627 (1986). The requirements of a legal duty depend on the specific facts and circumstances presented. *Village of Cross Keys, Inc. v. U.S. Gypsum Co.*, 315 Md. 741, 751-52 (1989)(quoting *W. Va. Central R. Co. v. Fuller*, 96 Md. 652, 671-72 (1903)("'the duty owed varies with the circumstances and with the relation to each other of the individuals concerned[.]'")). Whether a duty is owed "represents a policy question of whether the specific plaintiff is entitled to protection from the acts of the defendant." *Blondell*, 413 Md. at 120 (citation omitted).

In determining the existence of a duty, we consider, among other things:

"The foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of

17

imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved."

*Ashburn*, 306 Md. at 627 (1986)(quoting *Tarasoff v. Regents of Univ. of California*, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334, 342 (1976)).

No Maryland case has addressed the specific issue before us in the context of a fire caused by a condition that is not inherently dangerous but rather is considered to be normal, absent extenuating circumstances. The Court of Appeals has determined that a property owner owes a common law duty of reasonable care to the owners and occupants of neighboring property when conducting activities on his or her property so as to avoid harm to the neighboring property. In *Frenkil v. Johnson*, 175 Md. 592 (1939), the Court of Appeals considered a case involving a plaintiff who sustained injuries while seated in his vehicle on a street when an explosion occurred in a nearby building that the defendants were demolishing. Employees of the defendant reported the smell of gas in the building being demolished and, after an investigation, the gas company removed some gas meters and plugged some service pipes that entered the building. *Frenkil*, 175 Md. at 598. Thereafter, the employees continued to smell gas and reported the situation to their supervisor, but no further action was taken to locate the source of the gas or otherwise remedy the situation. *Id.* After the explosion, it was determined that the gas was not entering the building because of any defect in the prior work by the gas company, but rather through a stone foundation wall. *Id.*

In discussing the tort liability of the defendant, who was occupying the premises for the purpose of demolishing the building, the Court of Appeals recognized the general

18

principle of law that, within certain limitations, "one must use his own rights and property so as to do no injury to those of others." *Id.* at 599. With respect to a dangerous condition, such as the escape of gas, the Court wrote:

> [A]fter the occupier or possessor knows or should know of the danger of the artificial condition of the premises to others outside the land, and fails to exercise reasonable care and diligence to make the condition reasonably safe either by removing the danger or by giving adequate warning or by using other effective safeguards, the occupant or possessor becomes liable to persons outside the land for injuries which are the proximate result of such artificial conditions.

*Id.* at 600.

The Court determined that the "perils of explosion and fire" from the accumulation of gas in the building being demolished "were obvious and known to the defendant for such a length of time as to make it a question for the jury whether the defendant, after he knew of the dangerous condition of the premises to others without the land, had not failed to use reasonable care and diligence to prevent injuries by explosion to travelers upon the adjoining public streets." *Id.* at 601. The Court elaborated:

> Should injury befall the traveler because of the realization of the potential danger, it is sufficient for the traveler's recovery to establish the existence and nature of the dangerous situation and that his injury was the direct and natural consequence and development of the negligence of defendant in maintaining such a condition. Such testimony would establish that the injury had been inflicted during the period of defendant's negligence and as a consequence of its inherently dangerous existence. The breach of duty owed by the defendant to the traveler on the highway was the former's failure to use the premises of which he was then in the exclusive possession with that degree of care and diligence which an ordinarily prudent man would, under similar conditions, have reasonably exercised so as to prevent the dangerous state of the premises to become the proximate cause of injury to a traveler in the lawful and careful use of an adjacent municipal highway.

19

*Id.* at 602.

With regard to the plaintiff's burden of proof, the Court noted that it was "immaterial for the plaintiff to prove the particular manner whereby the free illuminating gas exploded." *Id.* The Court determined that:

> In any aspect of the proof, the proximate and efficient cause of the explosion was the presence of free gas. If the particular act or thing which set off the explosion was an act or condition for which either the defendant, through his servants, or a third party, was responsible, it would necessarily be an additional act or omission of the defendant or one of the third party without legal significance so far as the plaintiff's right of recovery is affected, since the injury was inflicted while the defendant's own wrongful act was continuing in force and operation. In the hypothesis made, if the ignition was by the act or nonfeasance of the defendant, the testimony would be unnecessary to establish the plaintiff's right of action; if, on the other hand, it was the act or omission of a third party, it would not affect the plaintiff's right of action against the defendant, whose negligence remained in existence to become concurrent. As observed in *Consolidated Gas Company v. Getty*, 96 Md. 683, at page 690, 54 A. 660, at page 662, 94 Am.St.Rep. 603: 'But it is equally true that no wrongdoer ought to be allowed to apportion or qualify his own wrong; and that, as a loss has actually happened whilst his own wrongful act was in force and operation, he ought not to be permitted to set up as a defense, that there was a more immediate cause of the loss, if that cause was put into operation by his own wrongful act.'

*Id.* at 602-03 (some citations omitted).

More recently, in *La Belle Epoque, LLC v. Old Europe Antique Manor*, 406 Md. 194 (2008), the Court of Appeals considered a negligence action involving allegations that La Belle Epoque, LLC ("La Belle Epoque"), a tenant in the upstairs unit in a commercial building, negligently created a pile of trash and debris in an alley that, after substantial snow and rain, led to the infiltration of runoff water into the downstairs unit

20

occupied by another tenant, Old Europe Antique Manor ("Old Europe"). The trial court granted summary judgment in favor of the landlord and La Belle Epoque, but the Court of Appeals reversed, holding, in part, that La Belle Epoque "would be liable for its own negligence for injury caused to others resulting from the placement of debris in the alley, whether or not the alley is considered a common area." *Id.* at 218. The Court of Appeals explained that "[a] person who negligently fails to make the condition reasonably safe can be liable for harm that the condition causes to neighboring properties." *Id.* at 219. According to the Court, "a reasonable trier of fact could conclude that a pile of trash and debris that La Belle Epoque allegedly allowed to accumulate in the alley constituted a dangerous condition on the premises and that La Belle Epoque failed to remove the debris or protect others from that condition." *Id.*

The same holding was reached by the Supreme Court of Oregon in *Hesse v. Century Home Components, Inc.*, 267 Or. 53 (1973). That case involved an action by adjoining property owners against the owner of a wood-manufacturing plant for loss of property by fire. The plaintiffs alleged that the defendant, who constructed components for pre-fabricated houses, stored sawdust and wood trimmings in an open wooden box, that the night before the fire, defendant's janitor put sawdust containing linseed oil into the box, and that a fire originated in the box. *Hesse*, 267 Or. at 55-56. It was not known what sparked the fire, and the court recognized that it could have been started by arson, by accidental act of a third person or one of defendant's employees, or by spontaneous combustion. *Id.* at 56. It was clear, however, that the fire spread across a timber dock to a warehouse and destroyed property of the plaintiffs that was stored therein. *Id.*

21

Plaintiffs alleged that the owner of the wood-manufacturing plant was liable for the fire because it negligently maintained its premises, it knew, or should have known, that a fire could be anticipated, and it failed to take precautions to prevent the start and spread of a fire. *Id.* The trial court instructed the jury, in part, as follows:

> Every person has the duty to maintain his premises in a reasonably safe condition to avoid the likelihood of spread of fire therefrom. If you find that the defendant placed or stored inflammable waste in an inflammable trash box under such circumstances and conditions that the defendant knew, or in the exercise of reasonable care should have known that any fire in the trash box would be likely to spread to the building and adjacent structures, then you should find the defendant negligent in that respect.

*Id.*

The Supreme Court of Oregon held that, taken as a whole, the jury instructions adequately set forth the law. *Id.* at 57. *Accord: Scully v. Fitzgerald*, 843 A.2d 1110 (N.J. 2004) (A landlord breached his duty by storing construction debris in a storage area when he knew or should have known that persons discarded cigarette butts near the storage area.).

In the case at hand, Steamfitters used its property in a normal manner. Unlike the cases we cited, Steamfitters did not store unusually flammable materials on its property. The mulch on the strip of land near the fence was used in an ordinary manner. Nevertheless, there was evidence from which the jury could determine that Steamfitters was aware that hundreds of cigarettes had been discarded in the mulch and that this practice put it on notice that a dangerous practice was occurring on its property, specifically the disposal of cigarettes in a combustible substance. The mulched area was a

22

common area, not part of the space used by the Training Fund for classes. A duty arose because the otherwise normal condition became dangerous by virtue of the practice of persons tossing cigarette butts into the mulch. Case law addressing premises liability with respect to harm caused to neighboring properties by a condition on the premises range from harm caused by an inherently dangerous artificial condition created or permitted to remain by the owner, that requires little advance notice of a certain practice, to a case such as this, *i.e.*, a condition that becomes dangerous because of a certain practice. We emphasize that this conclusion rests on the evidence from which a jury could find that a large number of cigarette butts were discarded in the mulch over a long period of time prior to the fire. It was for the jury to resolve conflicts in the evidence presented and to determine whether Steamfitters breached its duty of care to neighboring property owners to avoid the likely spread of fire arising from a cigarette discarded in mulch. Accordingly, the trial court did not err in denying Steamfitters' motion for judgment and permitting the jury to resolve the negligence claim.

## II.

Steamfitters next contends that expert testimony was required to prove the applicable standard of care and establish the reasonable steps a commercial landowner must take to fulfill its duty to prevent cigarettes from being discarded in mulch and causing a fire. It argues that the standard of care with respect to the management of commercial property involves complex issues of civil engineering and building codes that are "outside the ken of the average layperson," and that the corrective actions suggested

by the plaintiffs to deal with the disposal of cigarettes on Steamfitters' property lacked any showing of reasonableness, cost, or that they were within industry standards.

Plaintiffs reject that contention and argue that expert testimony was not required to establish the standard of care applicable to their claims, that the jurors were free to use their common knowledge and experience to consider reasonable steps that could have been taken to prevent a fire. We agree with the plaintiffs that, under the specific facts of this case, expert testimony was not required.

Maryland Rule 5-702 provides that "[e]xpert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *See also Bryant v. State*, 393 Md. 196, 203-04 (2006)("[i]n exercising the wide discretion vested in the trial courts concerning the admissibility of expert testimony, a critical test is whether the expert's opinion will aid the trier of fact.")(quotations and citations omitted). The Court of Appeals has noted that "[e]xpert testimony is *required* 'only when the subject of the inference . . . is so particularly related to some science or profession that is beyond the ken of the average layman[; it] is not required on matters of which the jurors would be aware by virtue of common knowledge.'" *Johnson v. State*, 457 Md. 513, 530 (2018)(quoting *Bean v. Dep't of Health and Mental Hygiene*, 406 Md. 419, 423 (2008)). Numerous Maryland cases have held that expert testimony is not required in cases where the issue is not beyond the understanding of the average juror. *See e.g., Johnson*, 457 Md. at 532 (expert testimony not required for admission of GPS data); *Gross v. State*, 229 Md. App. 24, 34 (2016)(expert testimony not required for admission of GPS data); *Titan*

24

*Custom Cabinet, Inc. v. Advance Contracting, Inc.*, 178 Md. App. 209, 230 (2008)(admission of weather reports without expert testimony neither complicated nor outside ordinary layperson's knowledge); *CIGNA Property and Cas. Companies v. Zeitler*, 126 Md. App. 444, 469 (1999)(expert testimony not required to support customer's claim that broker negligently failed to acquire the insurance requested on an application form because issue not beyond the understanding of the average juror).

On the issue of whether expert testimony was required, plaintiffs direct our attention to a New Jersey case, *Scully v. Fitzgerald*, *supra*, in which the New Jersey Supreme Court considered a claim for damages by a commercial tenant that the landlord breached his duty to keep areas within his control in a reasonably safe condition so as not to endanger the lives or property of his tenants. The commercial tenant alleged that the landlord breached his duty of care "because of the dangerous manner in which he maintained an open storage area with construction debris and refuse and because he should have been aware that tenants discarded cigarette butts in direct proximity to those flammable materials, creating a substantial fire hazard." *Scully*, 843 A.2d at 1112-1113. The trial court granted summary judgment in favor of the landlord and held that an expert's opinion was required to establish the landlord's negligence. *Id.* at 1114.

On appeal, New Jersey's intermediate appellate court rejected that holding because "the issues in dispute fell within the common knowledge of jurors." *Id.* The court held that the tenant "did not have to show that [the landlord] violated a code or other regulatory standard provided that he could prove the breach of a duty of care owed to [him] that was the proximate cause of [his] loss." *Id.*

25

The Supreme Court of New Jersey agreed, stating:

> As we said in *Butler v. Acme Markets, Inc.*, 89 N.J. 270, 283, 445
> A.2d 1141, 1147 (1982):
>
>> There is no general rule or policy requiring expert testimony
>> as to the standard of care. . . . The test of need for expert
>> testimony is whether the matter to be dealt with is so esoteric
>> that jurors of common judgment and experience cannot form
>> a valid judgment as to whether the conduct of the party was
>> reasonable.
>
>> Certain dangerous conditions that create the foreseeable risk of fire
>> are well known to ordinary people and are a matter of common knowledge.
>> A jury does not need a fire expert to explain to it the dangers that might
>> follow when a lit cigarette is thrown into a pile of papers or other
>> flammable material.  The duty involved in this case was not of an esoteric
>> nature.  Storage of a gas engine lawn mower and a gas engine snow blower,
>> as well as mulch, assorted construction debris, old papers, and garbage
>> outside of trash cans in an open storage area where cigarettes were
>> discarded regularly may be found to be a breach of a landlord's duty to
>> exercise reasonable care to guard against the risk of fire.  It is within the
>> province of the jury ultimately to determine whether defendant breached
>> that duty.

*Scully*, 843 A.2d at 1118.

The same result is warranted in the instant case. The plaintiffs did not allege that

Steamfitters violated a duty established by building codes or civil engineering principles,

but rather asserted that Steamfitters owed a common law duty to maintain its property in

a reasonably safe manner so as to prevent harm to neighboring properties.  The

foreseeable risk of fire created by habitually discarding cigarettes in a combustible

substance is a matter of common knowledge, well known to ordinary people.  Likewise,

the duty to exercise reasonable care to guard against the risk of fire was not so esoteric as

to require expert testimony. It was up to the jury to determine what constituted reasonable care to guard against the risk of fire and whether Steamfitters breached that duty.

## III.

Steamfitters challenges the trial court's instruction to the jury on spoliation of evidence. That instruction pertained to a video recording from a surveillance camera on Steamfitters' building that pointed close to the area where the fire was alleged to have originated. Steamfitters failed to produce that video recording in discovery and there was evidence from which the jury could conclude that the recording was "taped over" 30 days after the fire. Steamfitters argues that before it was taped over, the plaintiffs determined that the recording was "useless" and that there was no evidence that it would have shown any "persons or anything else of relevance." According to Steamfitters, the trial court abused its discretion in giving the jury the standard spoliation instruction which addressed both negligent and intentional spoliation of evidence. Steamfitters' arguments are without merit.

In considering a trial court's decision to grant or deny a requested jury instruction, we consider "whether the requested instruction was a correct exposition of the law, whether that law was applicable in light of the evidence before the jury, and finally whether the substance of the requested instruction was fairly covered by the instruction actually given. *Malik v. Tommy's Auto Service, Inc.*, 199 Md. App. 610, 616 (2011). Steamfitters' challenges to the spoliation instruction concern the second consideration, whether the law was applicable in light of the evidence before the jury. The rationale

27

behind that consideration is "that instructions not supported by the evidence have the capacity to lead the jury away from the evidence actually presented." *Anderson v. Litzenberg*, 115 Md. App. 549, 559 (1997). We review the instructions under an abuse of discretion standard. *S&S Oil, Inc. v. Jackson*, 428 Md. 621, 640 (2012).

### A. Evidence Pertaining to Video Recording

At trial, Lieutenant Crosby testified that his office identified 3 surveillance cameras in the vicinity of the fire. One was mounted on Falco's building, one was on a church across the street from the fire, and the third was on Steamfitters' building. Lieutenant Crosby assigned two individuals from his office to obtain the video recordings from those security cameras. Recordings from Falco's building and the church were obtained, but no recording was received from Steamfitters.

Lieutenant Crosby gave the following testimony with respect to the date on which individuals from his office requested a copy of the video recording from the camera mounted on Steamfitters' building:

[Counsel for Erie]: And were there efforts made to obtain those videos?

[Lieutenant Crosby]: Yes.

Q. And when did your office attempt to secure those videos in terms of timing? From the date of the fire, how many days out were those requests made?

A. Well, we know that videos are time sensitive as far as security goes. Most of them that have seven days, most of them have 30 days, so we try to do it within that seven-day period. I'm not sure exactly which day Investigator Murray and Investigator Wells went and obtained those videos, but we did get the information from who could provide those videos from Fal[c]o and the church from across the street.

28

Q. And did your office request copies of any security videos from the Steamfitters?

A. Yes.

Q. Did you ever receive them?

A. No.

Q. Do you know when that request was made?

A. I don't know the exact date when it was made because, like I said, we had people assigned to different portions of the investigation. And Fire Investigator Murray and Captain Wells were assigned to get the video. I'm not sure what day that they went.

At some point after the fire, Erie's claims adjuster, Dustin Sclater, went to Steamfitters' building and met with certain individuals in an attempt "to get some information regarding the cause of the fire." He could not recall the name of the person he met with, but he understood that person to be an employee of Steamfitters. As Mr. Sclater entered Steamfitters' building, he saw a security monitor pointed toward Gordon's construction yard and took a photograph of it. Mr. Sclater could not recall if he asked for a copy of the surveillance video from the day of the fire, but he testified, "I'm sure I would have asked for a copy" and that he "probably would have asked" for one.

The testimony about who was present when Mr. Sclater went to Steamfitters' building was unclear. Steamfitters' corporate representative, John Mastripolito, testified that at some unspecified time after the fire, he met with Mr. Sclater, who had come to Steamfitters' building to look at the video surveillance equipment. He testified that "there was two lieutenants. I don't know who the other one was." He believed the

29

lieutenants were from the fire department and that they viewed the surveillance footage with Mr. Sclater. Mr. Mastripolito told Mr. Sclater and the others present that they were free to take a copy of the video recording and he offered them a thumb drive, but they declined. On cross-examination, Mr. Mastripolito agreed that the lieutenants told him that "the film didn't show anything" and "was useless."[3] Mr. Mastripolito could not recall if Mr. Sclater told him that the recording was of no use to him, but he stated that Mr. Sclater did not disagree with the statements made by the lieutenants and did not ask that the video recording be preserved.

Mr. Sclater disagreed with Mr. Mastripolito's version of events. He testified that when he went to Steamfitters' building, the only person with him was his supervisor from Erie. They were met by a woman and a man, not Mr. Mastripolito, who escorted them to an office. There were no other investigators present.

The parties do not dispute that counsel for Erie sent a letter, dated April 23, 2015, to Steamfitters' legal department that stated, in part:

> Please accept this letter as a request that you place a litigation hold on any documents, data or other forms of media that identify who was present on your property on the date of the fire. We would also the [sic] like the identity of any employees, apprentices or union members who may have been smoking near the fence separating your property and Gordon Construction's property.

---

[3] The trial judge gave a limiting instruction informing the jury that Mr. Mastripolito's testimony, that he was told the film was not important, could not be considered for the truth of the matter asserted, but only for the limited purpose of explaining why he acted the way he did after hearing that statement.

There is also no dispute that Steamfitters failed to preserve or produce the subject video recording. In his deposition, which was read for the jury, Steamfitters' corporate designee, Daniel Loveless stated, "[w]e were asked by our attorney to provide some footage of the – from the security cameras that we have, and we were able to determine that we couldn't go back that far. I think our video cameras stored 30 days, or whatever. And when we were asked, it was more than 30 days past the date of the fire, so we were unable to retrieve any of that."

## B. Spoliation Instruction

At the close of all the evidence, the trial court instructed the jury on the issue of spoliation[4], as follows:

> The destruction of or the failure to preserve evidence by a party may give rise to an inference unfavorable to that party. . . . If you find that the intent was to conceal the evidence, the destruction of – the destruction or failure to preserve evidence may be inferred to indicate that the party believes that his or her case is weak and that he or she would not prevail if the evidence was preserved.

---

[4] The instruction given by the court was based on Maryland Civil Pattern Jury Instruction 1:16, which provides:

> The destruction of or the failure to preserve evidence by a party may give rise to an inference unfavorable to that party. If you find that the intent was to conceal the evidence, the destruction or failure to preserve must be inferred to indicate that the party believes that his or her case is weak and that he or she would not prevail if the evidence was preserved. If you find that the destruction or failure to preserve the evidence was negligent, you may, but are not required to, infer that the evidence, if preserved, would have been unfavorable to that party.

31

Now, in this regard, the spoliation of the evidence, it has to do with film that the Steamfitters Union have, if they take pictures of their property, and whether they spoliated the evidence or spoiled that evidence by taping over the film.

The lawyers will argue about that, and they will explain it better than probably I have. But in any event, if you find that the destruction or failure to preserve the evidence was negligent, you may, but are not required to, infer that the evidence, if preserved, would have been unfavorable to the parties.

So it's up to you to find out whether – or make a determination as to whether that indicated that their case was weak or whether it indicated that they thought that it would be unfavorable to them in some respect.

After the jury was instructed, counsel for Steamfitters objected to the instruction on the ground that there was no factual predicate to support it. He pointed to Mr. Loveless's testimony for the proposition that the requested video recording had been taped over prior to the time the litigation hold letter was received. Counsel also argued that the requested video recording did not show the area where the fire was alleged to have originated and was not relevant.[5] Counsel for the plaintiffs countered that the video recording would have shown an area "unbelievably close" to where the fire was alleged to have originated and might have shown what people were doing on the parking lot. Counsel for Steamfitters responded that "this video might have showed people congregating here, it might have also been completely irrelevant, which is what Mr. Sclater told my folks. So why preserve it anyway? They haven't made a showing that

---

[5] Counsel's objection was based on lack of relevancy of the video recording. Counsel did not otherwise object to the analysis of the trial judge and did not object to the language of the instruction. See *Cumberland Ins. Group v. Delmarva Power*, 226 Md. App. 691, 701 (2016) for a discussion of the elements of spoliation.

there would be any reason to ever preserve this video." The court rejected Steamfitters' argument that the instruction was unwarranted and overruled its objection.

## C. Propriety of the Spoliation Instruction

Steamfitters contends that the spoliation instruction was not warranted because the party requesting the instruction had referred to the evidence as "useless" and declined to take a copy of the video recording when one was offered. In addition, it argues that the videotaped area was only "unbelievably close" to the area of interest and did not show directly the area where the fire started.

Steamfitters' argument that the subject video recording was irrelevant because it only depicted an area close to the alleged origin of the fire is without merit. The camera was pointed at an area that would have captured people, if any, who were on Steamfitters' property prior to and at the time of the fire, as well as a portion of the property close to the origin of the fire. Video of that area might have captured other evidence such as that depicted on the other video recordings that were shown to the jury, which were used to establish, among other things, the color of smoke, wind direction, and wind speed.

"'The destruction or alteration of evidence by a party gives rise to inferences or presumptions unfavorable to the spoliator, the nature of the inference being dependent upon the intent or motivation of the party.'" *Anderson*, 115 Md. App. at 560 (quoting *Miller v. Montgomery County*, 64 Md. App. 202, 214-15, *cert. denied*, 304 Md. 299 (1985)). In *Anderson*, we explained:

33

"Unexplained and intentional destruction of evidence by a litigant gives rise to an inference that the evidence would have been unfavorable to his cause, but would not in itself amount to substantive proof of a fact essential to his opponent's cause. The maxim, *Omnia praesumuntur contra spoliatem*, "all things are presumed against the spoliator," rests upon a logical proposition that one would ordinarily not destroy evidence favorable to himself. In this case, if the jury were to find that Montgomery County had, in fact, altered [the subject evidence] but without fraudulent intent, it could infer therefrom that the [evidence] was defective. . . . If, however, the jury were to find that Montgomery County had altered [the evidence] with fraudulent intent to conceal the nature of the defect, such conduct may be taken as an indication of consciousness of the weakness of the county's case and a belief that its defense would not prevail without the aid of such improper tactics. Together with other evidence, that could lead to a further inference that Montgomery County tampered with the evidence because it was guilty of the wrong of which it was accused[.]"

*Id.* at 560-61 (quoting *Miller*, 64 Md. App. at 214-15) .

The evidence was subject to different interpretations as to why the video recording was not preserved. The jury was free to consider Steamfitters' explanations for failing to produce the evidence, to judge the credibility of the witnesses, and to draw inferences therefrom. *See DiLeo v. Nugent*, 88 Md. App. 59, 70-71 (1991)(when a party gives explanation for the failure to produce evidence, trial judge may give the jury the opportunity to evaluate the credibility of that explanation). We perceive no abuse of discretion in the court's decision to give the spoliation instruction.

### D. Intentional Spoliation

Steamfitters next argues that the trial court abused its discretion in giving the intentional spoliation portion of the instruction because there was no evidence that the video recording was intentionally destroyed. Plaintiffs counter that this issue was not

34

preserved properly for our consideration because Steamfitters failed to object to that specific portion of the jury instruction. We agree.

Maryland Rule 2-520(e) provides:

**Objections.** No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection.

This rule requires "parties to be precise in stating objections to jury instructions at trial, for the plain reason that the trial court has no opportunity to correct or amplify the instructions for the benefit of the jury if the judge is not informed of the exact nature and grounds of the objection." *Fearnow v. Chesapeake & Potomac Telephone Co. of Maryland*, 342 Md. 363, 378 (1996). If an objecting party fails to "'fully comply with the requirements of the rule . . . there is nothing for us to consider on an appeal.'" *Black v. Leatherwood Motor Coach Corp.*, 92 Md. App. 27, 34 (1992)(quoting *Casey v. Roman Catholic Archbishop of Baltimore*, 217 Md. 595, 612 (1958)). Because Steamfitters did not specifically raise before the trial judge the issue of the instruction's reference to intentional spoliation, that issue is not properly before us. Further, it cannot be said that Steamfitters substantially complied with Md. Rule 2-520(e), because there is nothing in the record to indicate that the trial judge understood the "precise point" of Steamfitters' objection to the portion of the standard instruction that addressed intentional spoliation. *Sergeant Co. v. Pickett*, 283 Md. 284, 289-90 (1978).

Even if Steamfitters' contention was properly before us, we would not find an abuse of discretion on the part of the trial judge in giving the intentional spoliation

35

portion of the instruction. It was a question for the jury as to whether the destruction of the evidence was the product of a mistake or an intentional act. *See generally Anderson*, 115 Md. App. at 560-61. None of the witnesses who testified about the subject video recording provided the precise date on which it was reviewed by either a representative of the plaintiffs or a fire investigator. From Lieutenant Crosby's testimony, however, it could be inferred that a request for the recording was made either within 7 days of the fire or, alternatively, within 30 days of the fire. The evidence did not disclose whether Steamfitters deleted or recorded over the video recording immediately following the meeting with Mr. Sclater and/or the lieutenants from the fire department, but there was evidence that the recording equipment was set up to record over existing video after 30 days. It was undisputed that the litigation hold letter from Erie's counsel was dated April 23, 2015, just 17 days after the fire, and sent to Steamfitters' via United Parcel Service, and that counsel for Steamfitters acknowledged receipt of that letter in an email sent on April 27, 2015. There was also no dispute that the video camera was directed to an area close to where the fire started. From the evidence presented, the jury could have concluded that Steamfitters intentionally ignored the request for the evidence to be preserved and allowed the video recording to be taped over 30 days after the fire.

**IV.**

Steamfitters' final contention is that the trial court erred in granting summary judgment in favor of the Training Fund in the third-party actions because there were genuine issues of material fact with respect to Steamfitters' claims for indemnity. Specifically, Steamfitters argues that summary judgment was not warranted because the

36

plaintiffs alleged that apprentices were negligent and the negligent acts arose out of the Training Fund's use and occupancy of Steamfitters' premises. Thus, the acts were within an indemnity provision included in an Agreement for the Use of Space ("Agreement") entered into by Steamfitters and the Training Fund. Steamfitters also asserts that there were questions of fact as to whether the Agreement extended past its expiration date. For the reasons set forth below, we find no error in the circuit court's decision to grant summary judgment in favor of the Training Fund in the third-party actions.

## A. Standard of Review

A circuit court may grant a motion for summary judgment "if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2-501(f). We review a circuit court's decision to grant summary judgment *de novo* and without deference, by independently examining the record to determine whether the parties generated a genuine dispute of material fact and, if not, whether the moving party was entitled to judgment as a matter of law. *Rowhouses, Inc. v. Smith*, 446 Md. 611, 630 (2016); *Walk v. Hartford Cas. Ins. Co.*, 382 Md. 1, 14 (2004). We consider the record "'in the light most favorable to the non-moving party,'" drawing any reasonable inferences against the moving party. *Rowhouses, Inc.*, 446 Md. at 631 (quoting *Hamilton v. Kirson*, 439 Md. 501, 522 (2014)). Ordinarily, we may "uphold the grant of summary judgment only on the grounds relied on by the trial court." *Campbell v. Lake Hallowell Homeowners, Ass'n*, 157 Md. App. 504, 518-19 (2004)(internal quotation marks and citation omitted).

37

## B. Indemnification

In its third-party complaints against the Training Fund, Steamfitters sought indemnification pursuant to the Agreement and, alternatively, common law indemnification and/or contribution, in the event it was held liable to plaintiffs for claims related to the fire. The Agreement, which was entered into between Steamfitters and the Training Fund on August 1, 2010, and expired at midnight on December 31, 2014, permitted the Training Fund to use four classrooms, the common areas of Steamfitters' building, and a designated portion of the parking lot for the purpose of conducting classes. The Agreement required Steamfitters to insure the building against loss or damage and the Training Fund to maintain insurance on the value of its personal property located within the premises. It also contained the following indemnity agreement:

> (d) Indemnity. Training Fund hereby agrees to indemnify, hold the Union harmless and defend the Union from and against any cost, damage, action, claim, liability or expense (including attorney's and other professional fees) incurred by or claimed against the Union, directly or indirectly, as a result of or in any way arising from Training Fund's use and occupancy of the Premises or any part thereof or out of any parking areas, sidewalks, or other amenities in the vicinity of the Premises, or in any other manner which relates to the business of the Training Fund.

The parties did not dispute the fact that the Training Fund continued to use the classrooms until May 27, 2015, and that it did not make any payments for the use of the premises after the expiration of the Agreement on December 31, 2014.

The Training Fund filed a motion for summary judgment as to Steamfitters' third-party complaints.[6] It argued, *inter alia*, that the Agreement expired more than 4 months before the date of the fire and there was no provision to extend the agreement beyond December 31, 2014. According to the Training Fund, even if the agreement had not expired, the fire did not arise from the Training Fund's operation of classes or a student's use of the parking lot; the fire arose from Steamfitters' use of its premises. The Training Fund also asserted that Steamfitters' claims for common law indemnification and contribution were without merit because they sounded in negligence. The Training Fund maintained that it owed no tort duty to Steamfitters and had no common law duty to prevent students or others from discarding cigarettes while awaiting the start of a class.

Steamfitters opposed the Training Fund's motion for summary judgment and argued that it was entitled to indemnification under the Agreement because the plaintiffs' allegations, that "apprentices waiting for Training Fund's classes to commence started the fire[,]" related, directly or indirectly, to the Training Fund's use and occupancy of the premises and the business of the Training Fund. Steamfitters also argued that it was entitled to common law indemnity and/or contribution because if it had a duty to police apprentices prior to the start of classes then the Training Fund owed that same duty.

At a motions hearing on July 13, 2017, counsel for Steamfitters abandoned its claims for common law indemnification and contribution and limited its claim to

---

[6] Steamfitters also filed a third-party complaint against Gordon seeking common law indemnification and contribution. The jury returned a verdict in favor of Gordon in that action.

indemnity based on the provision in the Agreement. The court took the Training Fund's motion for summary judgment under advisement and granted Steamfitters additional time to provide case law in support of its argument that the Agreement extended beyond the December 31, 2014 termination date.

On July 17, 2017, after further argument, the court granted summary judgment in favor of the Training Fund. The court recognized that appellees' claims were premised on Steamfitters' failure to make the premises reasonably safe, *i.e.*, its own negligence. The claims were premised on an unknown person, not necessarily an apprentice, discarding a cigarette. The court held that (1) the Training Fund did not explicitly agree to indemnify Steamfitters for its own negligence; (2) the Agreement, which contained the indemnification provision, had expired before the date of the fire; and (3) the plaintiffs' claims against Steamfitters did not arise out of the Training Funds' use of the premises, but out of Steamfitters' own use and operation of the premises.

We find no error in the circuit court's decision to grant summary judgment in favor of the Training Fund. In Maryland, there is a common law presumption that an indemnification agreement ordinarily does not cover liability resulting from the indemnitee's own negligence. *Bd. of Trustees, Cmty. Coll. of Baltimore County v. Patient First Corp.*, 444 Md. 452, 465 (2015). In accordance with that presumption, a court will not interpret an indemnification clause "to indemnify a person against his own negligence unless an intention so to do is expressed in those very words or in other unequivocal terms." *Crockett v. Crothers*, 264 Md. 222, 227 (1972). *See also Adloo v. H.T. Brown Real Estate, Inc.*, 344 Md. 254, 261-62 (1996) (recognizing same). The presumption may

be overcome when the indemnification clause of a contract expressly permits a party to recover for liability arising from the party's own negligence. *Mass Transit Admin. v. CSX Transp., Inc.*, 349 Md. 299, 307-10 (1998); *Kreter v. Healthstar Communications, Inc.*, 172 Md. App. 243, 258-60 (2007). As the *Adloo* court stated, the clause need not use the word "negligence" or any other "magic words," but it must be unambiguous and understandable before it is given effect. *Adloo*, 344 Md. at 264-66.

We construe the language of an indemnification provision in accordance with its customary, ordinary, and accepted meaning. *See Atl. Contracting & Material Co. v. Ulico Cas. Co.*, 380 Md. 285, 300-01 (2004). The indemnification provision in the subject Agreement is straightforward. The plain language of the provision makes clear that the Training Fund did not agree to indemnify Steamfitters for its own negligence. For that reason, the trial court properly granted summary judgment in favor of the Training Fund. In light of our holding, we need not address the other reasons given by the trial court in support of its grant of summary judgment.

> **JUDGMENTS OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

41

Circuit Court for Prince George's County
Consolidated Case Nos. CAL 15-38293 and CAL 16-07205

<u>REPORTED</u>

<u>IN THE COURT OF SPECIAL APPEALS</u>

<u>OF MARYLAND</u>

Nos. 1168 and 1142
September Term, 2017
_____

CONSOLIDATED CASES
_____

No. 1168
STEAMFITTERS LOCAL UNION NO. 602
v.
ERIE INSURANCE EXCHANGE, ET AL.
_____

No. 1142
STEAMFITTERS LOCAL UNION NO. 602
v.
CINCINNATI INSURANCE CO., ET AL.

_____

Berger,
Friedman,
Eyler, James R.
  (Senior Judge, Specially Assigned),

JJ.
_____

Dissenting Opinion by Friedman, J.
_____

Filed: May 30, 2019

I respectfully dissent. At bottom, the decision to impose a tort duty requires us to think about how to make things safer. The majority quotes *Ashburn* for this principle:

> In determining the existence of a duty, we consider, among other things:
>
>> The foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.

Slip op. at 17-18 (quoting *Ashburn v. Anne Arundel County*, 306 Md. 617, 627 (1986)).

The majority's decision concludes that if a landowner uses mulch landscaping and if third parties congregate to smoke (or at least to throw their cigarette butts) on that mulch, the landowner can be liable for resulting fires. I disagree with that result for several reasons:

- *First*, although my colleagues in the majority are clear that mulch is not dangerous, slip op. at 17, some will read their opinion as if that is its holding. Let me be plain: Use of mulch in landscaping should not be the source of a tort duty.

- *Second,* my colleagues in the majority seem to think that the existence of hundreds of cigarette butts in the mulch should have put the landowner on notice of the risk of fire. I think the opposite. None of those other cigarette butts caused a fire. If there were 1000 spent cigarette butts in the mulch, that is proof not of risk, but that 999 times a fire did not result. Moreover, this makes this case significantly different from the cases on which the majority relies, where dangerous conditions built up over time. *Cf. La Belle Epoque, LLC v. Old Europe Antique Manor, LLC*, 406 Md. 194, 219 (2008) (defendant who allowed trash and debris to accumulate in an alley was liable for damage

caused by runoff of trapped water); *Frenkil v. Johnson*, 175 Md. 592, 607-08 (1939) (defendant who was aware that illuminating gas was seeping into the building was liable for the ensuing explosion). Put simply, the old butts do not increase the risk of fire.

- *Third*, there is no allegation that the landowner was the person who smoked the cigarettes and discarded the cigarette butts. Thus, the majority's opinion extends tort liability to landowners for the actions of third parties over whom they have little control and with whom they have no demonstrated special relationship. *See Patton v. United States of Am. Rugby Football*, 381 Md. 627, 637-38 (2004); *Ashburn*, 306 Md. at 627-28 (*quoting Tarasoff v. Regents of University of California*, 17 Cal.3d 425, 434 (1976)).

- *Fourth,* in the future, landowners will seek to avoid tort liability by putting out more ashtrays and by cleaning cigarette butts out of their mulch more frequently. I hope they do, but only because it will make things cleaner. I have no belief that doing so will avoid fires.

For these reasons, I don't think imposing a duty of care will make anybody any safer.

Thus, I think the trial court erred in finding that the Steamfitters owed a duty of care and erred in failing to grant judgment on their behalf. As a result, I would reverse.

2