*Steamfitters Local Union No. 602 v. Erie Insurance Exchange, et al.; Steamfitters Local Union No. 602 v. Cincinnati Insurance Company, et al.*, No. 40, September Term, 2019, Opinion by Booth, J.

**TORT LIABILITY – PROPERTY OWNER'S DUTY OF CARE TO NEIGHBORING PROPERTY OWNER TO MAINTAIN PROPERTY IN A MANNER TO AVOID RISK OF FIRE.** For at least the past 80 years, this Court has recognized that ownership, operation, and maintenance of property comes with a common law duty to use reasonable care so as not to cause harm to the neighboring property owners. A duty may arise when, viewing the totality of the circumstances, there exists a dangerous or hazardous condition on the property and the property owner was on notice of the dangerous or hazardous condition. Under the specific facts and circumstances presented in this case, the defendant commercial property owner owed its neighbors a common law duty to maintain its property in a manner that would not cause an unreasonable risk of a fire spreading to the neighboring property. Under the facts presented, there was evidence from which the jury could determine that the defendant had actual or constructive knowledge that hundreds of cigarettes had been discarded in the mulched common area along the property line, which created a foreseeable risk of fire spreading to the neighboring property. It was for a jury to resolve conflicts in the evidence presented to determine whether the defendant breached its duty of care to neighboring property owners to avoid the likely spread of fire arising from a cigarette discarded in mulch.

**EXPERT TESTIMONY – MATTERS WITHIN COMMON KNOWLEDGE.** Expert testimony was not required to prove the applicable standard of care and to establish the reasonable steps a commercial landowner must take to fulfill its duty to prevent cigarettes from being regularly discarded in mulched common areas in order to avoid causing a fire. Preventative steps that could have been taken are not outside the ken of the average layperson. Jurors were free to use their common knowledge and experience to consider reasonable steps that could have been taken to prevent a fire. Similarly, the foreseeable risk of fire being created by habitually discarding cigarettes in a combustible substance is a matter of common knowledge, well known to ordinary people.

**SPOLIATION INSTRUCTION.** The trial court did not abuse its discretion when it instructed the jury on spoliation of the evidence under the facts presented in this case.

**CONTRACTUAL INDEMNIFICATION.** The trial court did not err in granting summary judgment in favor of the third-party defendant on the third-party complaint for contractual indemnification. Under the plain language of the indemnification provision, the third-party defendant did not agree to indemnify the third-party plaintiff for its own negligence.

Circuit Court for Prince George's County
Case Nos.: CAL 15-38293; CAL 16-07205
Argued: January 10, 2020

IN THE COURT OF APPEALS
OF MARYLAND

No. 40

September Term, 2019

STEAMFITTERS LOCAL UNION NO. 602

v.

ERIE INSURANCE EXCHANGE, et al.

STEAMFITTERS LOCAL UNION NO. 602

v.

CINCINNATI INSURANCE COMPANY, et al.

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.

Opinion by Booth, J.

Filed: July 27, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

"Only You Can Prevent Wildfires."

-Smokey Bear[1]

In this case, we are asked to determine whether the owner of a commercial property owes its neighbor a common law duty to use reasonable care to prevent the risk of a spread of fire, where the property owner knows, or should know, that persons are habitually discarding hundreds of cigarette butts in a mulched common area along the boundary between the properties.

On April 6, 2015, a fire started on property owned by Steamfitters Local Union No. 602 ("Steamfitters") in Capitol Heights, Maryland, in a mulched strip of common area running along the boundary line between Steamfitters' property and a commercial construction yard owned by Gordon Contractors, Inc. ("Gordon"). The fire spread along a chain-link fence that separated the properties, causing property damage to Gordon's

---

[1] Created in 1944, the Smokey Bear Wildfire Prevention campaign is the longest-running public service advertising campaign in U.S. history. *See* https://perma.cc/Q748-KE8Z. Beloved by children for decades, Smokey Bear's image is protected by U.S. federal law and is administered by the United States Forest Service, the National Association of State Foresters, and the Ad Council. *Id.* Although in the early years, the bulk of Smokey's campaign was directed at forest fires, as reflected in the 1947 slogan ("Remember . . . Only YOU can Prevent Forest Fires[]"), the slogan was updated in 2001 to its current version of "Only You Can Prevent Wildfires" in "response to a massive outbreak of wildfires in natural areas other than forests and to clarify that Smokey is promoting the prevention of unwanted and unplanned outdoor fires versus prescribed fires." Over the years, Smokey's public service announcements have warned about the dangers of discarding cigarette butts by throwing them out car windows or discarding them in flammable materials. To this day, Smokey's message includes advice on the disposal of cigarettes and tobacco products, warning persons not to "throw smoking materials" into combustible materials such as "brush or leaves." https://perma.cc/EHT3-5H4D.

construction yard, as well as to a property adjoining Gordon's property. The fire was started in an area where Steamfitters' apprentices regularly congregated for hours at a time, prior to the commencement of their training classes held in Steamfitters' union hall. During the investigation into the cause of the fire, hundreds of cigarette butts that had been discarded in the mulch were recovered.

The litigation that resulted from the fire damage commenced on December 14, 2015, when Gordon and its insurers, Erie Insurance Exchange ("Erie") and Continental Casualty Company ("Continental") filed a complaint in the Circuit Court for Prince George's County against Steamfitters alleging a single count of negligence and claiming damages of $1,276,200.24.

Steamfitters filed a third-party complaint against the Heating, Piping and Refrigeration Training Fund (the "Training Fund"), alleging contractual indemnification, common law indemnification, and contribution.

A second action was commenced on March 4, 2016, when Cincinnati Insurance Company ("Cincinnati"), as the subrogee of Falco Industries, Inc., C & M Properties, LLC, C & M Properties Delaware, LLC, and Garage Center, LLC (referred to collectively as "Falco") filed a complaint against Steamfitters in the Circuit Court for Prince George's County, alleging a single count of negligence. Cincinnati alleged that the fire started in the mulched strip of land on Steamfitters' property and spread to Falco's property, causing substantial damage to Falco's real property and personal property. Steamfitters also filed

2

a third-party complaint against the Training Fund with respect to Cincinnati's claim, alleging contractual indemnification, common law indemnification, and contribution.[2]

In April 2016, the two cases were consolidated. For ease of reference, we shall refer to Gordon, Erie, Continental, and Cincinnati as either the Plaintiffs or the Respondents.

Steamfitters and the Training Fund filed cross-motions for summary judgment on the issue of contractual indemnification.[3] After a hearing, the circuit court denied Steamfitters' motion and granted summary judgment in favor of the Training Fund. The circuit court found that Steamfitters was not entitled to indemnification under the use agreement between the parties ("Agreement") because: (1) the Training Fund did not explicitly agree to indemnify Steamfitters for Steamfitters' own negligence; (2) the Agreement expired before the fire occurred; and (3) the claims against Steamfitters did not arise out of the Training Fund's use of the premises. Steamfitters also moved for summary judgment against the Plaintiffs on the negligence claims. The court denied Steamfitters' motions.

The case against Steamfitters was tried before a jury from July 17–20, 2017. Steamfitters moved for judgment at the conclusion of the Plaintiffs' case-in-chief, at the conclusion of the defense, and at the conclusion of the Plaintiffs' rebuttal case. In doing so, Steamfitters argued that it had no common law duty to the neighboring properties. The

---

[2] In the case filed by Cincinnati, as a subrogee of Falco, against Steamfitters, Steamfitters also filed a third-party complaint against Gordon containing two counts: common law indemnification and contribution.

[3] Steamfitters abandoned its claims for common law indemnification and contribution before judgment was entered on the parties' cross-motions.

3

trial judge denied the motions. The jury returned verdicts in favor of the Plaintiffs.

Damages were awarded in favor of Erie, as the subrogee of Gordon, in the amount of

$1,039,176.67; in favor of Gordon, individually, in the amount of $111,125.38; in favor of

Continental, as Gordon's subrogee, in the amount of $72,338.48; and in favor of

Cincinnati, as subrogee of Falco, in the amount of $119,909.10. Steamfitters noted a timely

appeal. The Court of Special Appeals affirmed the trial court's judgments in a split

decision. *See Steamfitters Local Union No. 602 v. Erie Ins. Exch.,* 241 Md. App. 94 (2019)

(Friedman, J., dissenting).

Steamfitters petitioned for writ of *certiorari*,[4] which we granted to consider the

following questions, which we rephrased:

1. Does an owner of commercial property owe the neighboring property owners a duty to use reasonable care to prevent the spread of fire, where the property owner knows, or should know, that persons are habitually discarding hundreds of cigarette butts in a mulched common area adjacent to the property line?

2. Was expert testimony required to establish this duty?

---

[4] The questions presented in the petition for writ of *certiorari* were:

1. Do landowners owe their neighbors a duty of care to protect against potential fires starting in normal, harmless areas of the property, such as landscape mulch, caused by third persons over whom they have no control?

2. Does a plaintiff need to provide expert testimony as to reasonable, standard and effective measures to prevent such fires?

3. Under the facts and circumstances of this case, was the spoliation instruction unfairly prejudicial to the appellants?

4. Was it proper for the trial court to enter summary judgment on an indemnification agreement where the contention was that the negligence was that of third parties whose activities were related to the indemnitor and where there were questions of fact with regard to whether the contract had expired?

3. Did the circuit court abuse its discretion in giving a spoliation instruction under the facts of this case?

4. Did the circuit court err in granting summary judgment in favor of the third-party defendant on the issue of contractual indemnification?

For the reasons more fully discussed herein, we answer the first question in the affirmative, and questions two through four in the negative. We affirm the judgment of the Court of Special Appeals in its entirety.

## I.

### Factual Background

Steamfitters owns and maintains a union hall in Capitol Heights, Maryland. The union has apprentices who pay dues and receive training, among other benefits. The Training Fund operated an apprentice school in the union hall and provided training to Steamfitters' apprentices, pursuant to a written Agreement with Steamfitters for the use of space.

Gordon owns a construction material yard adjacent to Steamfitters' union hall. Falco occupies a commercial warehouse that is on the other side of Gordon's property. The Gordon and Steamfitters properties were separated by a chain-link fence with security slats. Steamfitters created and maintained a ten-foot-wide mulch bed that ran approximately 200 feet along the fence between its parking lot and Gordon's yard. The mulch bed consisted of shredded wood mixed with dead pine needles from trees planted in the bed.

Gordon and Falco alleged that the April 6, 2015, fire started on Steamfitters' property after a lit cigarette was discarded in the mulched area on Steamfitters' side of the fence. The

5

fire spread along the fence between the properties and ignited foam insulation that was stored against the fence on Gordon's side that liquefied, thereby causing further spread, and ultimately engulfing multiple vehicles and the contents of a large dumpster. Before it was extinguished, the fire also spread to property belonging to Falco and its business affiliates. Gordon and Falco did not allege that Steamfitters was vicariously liable or that it had a duty to control the unknown person who allegedly discarded the cigarette. Rather, Gordon and Falco proceeded on the theory that Steamfitters, as the property owner, failed to use reasonable care to prevent the foreseeable risk of fire spreading to nearby properties.

The Court of Special Appeals summarized the trial testimony and evidence pertinent to the matters presented on appeal. *See Steamfitters Local Union No. 602* ("*Steamfitters*"), 241 Md. App. at 104–10. We paraphrase the court's summary below.

Steamfitters' business manager and corporate designee, Daniel Loveless, generally explained the apprentices' use of Steamfitters' property. Because the apprentices work all over the Washington, D.C., metro area, and often do not have time to go home before classes, Steamfitters provided its apprentices with a parking lot on its property on which to congregate, sometimes for hours before classes. Apprentices would arrive between 2:30 p.m. and 5:00 p.m. Over time, Mr. Loveless observed that, prior to the start of classes, apprentices passed the time by napping, gossiping, minding their own business, and smoking, and that some drank beer. Mr. Loveless was responsible for property maintenance. Although no employee was specifically assigned the task of cleaning up trash along the fence that separated Steamfitters' and Gordon's properties, Mr. Loveless had done so on two or three occasions prior to the fire. According to Mr. Loveless, the

6

mulch had not been replaced in a while, and the ground was bare in some areas. During his deposition, Mr. Loveless testified that he was unclear whether he had seen cigarette butts in the mulch prior to the fire. However, he admitted that after the fire, he saw cigarette butts in the mulch. Mr. Loveless acknowledged that there were more butts "than there should have been," and that, "[i]n the right situation," a carelessly discarded cigarette could start a fire. Excerpts from Mr. Loveless's deposition were read to the jury at trial, including his admission that cigarettes discarded into mulch present a risk of fire:

> Q.     Do you agree it's a fire hazard throwing cigarette butts in mulch?
> A.     I think so, yes.

Mr. Loveless testified that he was "pretty sure" that Steamfitters did not have a smoking policy. He also confirmed that smoking was permitted outside of the union building. It was undisputed that Steamfitters did not issue any guidelines, communications, policies or recommendations regarding smoking and that there were no signs prohibiting smoking on Steamfitters' property.

John Mastripolito, a corporate representative of Steamfitters, testified that he walked through the mulched area eight times between February 2015 and the date of the fire. He stated that he did not see any cigarette butts in the mulch, but acknowledged that he had poor vision, wore glasses, and would not be concerned even if there were 100 cigarette butts in the mulch because he was "just not into cigarette butts[.]"

The weather on the date of the fire was dry and windy. The fire was investigated independently by the Prince George's County Fire Marshal's Office, and also by fire investigators for all parties. Wayne Crosby, an acting lieutenant and fire investigator

7

assigned to the Prince George's Fire Marshal's Office, was the lead investigator for the fire. He testified as an expert in fire origin, cause, growth, and spread. Lieutenant Crosby determined that the fire started in the mulch bed on Steamfitters' side of the fence and that there was constant wind on the day of the fire, with gusts up to 40 miles per hour, which kept the fire low and pushed it down the fence line toward a dumpster, where it grew. He opined that the embers from the mulch were blown by the wind into Gordon's construction yard where they ignited combustible foam insulation, and that the fire continued to grow. Lieutenant Crosby described how the foam insulation liquified and ran down the parking lot to one side of the Falco property, burning two fire trucks along the way.

Lieutenant Crosby opined that the only possible ignition source for the fire was a cigarette. He noted that a very large number of cigarette butts were found in the mulch on Steamfitters' side of the fence, and he opined that the fire started when someone flicked a cigarette into the mulch near the fence or when the wind blew a cigarette butt up against the fence. Lieutenant Crosby acknowledged that the combustible foam insulation on Gordon's property was stored too close to the fence line, in violation of certain code provisions. However, he concluded that because of the strong winds, where the material was stored was immaterial.

Vehicles parked on Gordon's property were damaged in the fire. Lieutenant Crosby testified that he ruled out the vehicles as the cause of the fire. He stated that the vehicles were burned from left to right and that there was no fire damage on one side of them. Lieutenant Crosby explained that if the fire had started in one of the vehicles, it would have been totally consumed.

8

In concluding that the fire had not originated in one of the vehicles, Lieutenant Crosby testified that he reviewed a videotaped interview of Richard Grasso, who had been teaching an apprentice class at the time the fire was discovered. Mr. Grasso said that a student told him there was a fire in the parking lot. In both his recorded interview and a written statement, Mr. Grasso stated that he walked across the parking lot, looked over the fence, and saw a vehicle on Gordon's property that had smoke coming out from under its hood. In a later interview, Mr. Grasso stated that he saw the fence line on fire.

As part of their investigation, the Fire Marshal's Office canvassed the area to obtain videos from building-mounted cameras and cell phones. Three building-mounted cameras that might have captured relevant information were identified—a surveillance camera on the Falco property, a camera affixed to the exterior of a church across from Steamfitters' property, and a camera located on the exterior of Steamfitters' building. Lieutenant Crosby obtained and reviewed the video recordings from the Falco property and the church. He requested, but did not receive, the video recording from Steamfitters' building. Neither of the videos showed Mr. Grasso, or any other person, walk across the parking lot and look over the fence at the vehicles parked on Gordon's property. The video from the church showed "a lot of white smoke . . . burning for a long time[,]" which supported Lieutenant Crosby's conclusion that the fire started at the fence line.

Lieutenant Crosby collected a sample of the mulch and conducted a burn test, which demonstrated that a cigarette butt could start a mulch fire under wind conditions similar to those that existed on the day of the fire. The video recording of the burn test was played for the jury.

Dale Wauters, Gordon's operations manager, was familiar with Gordon's construction yard, and testified to the conditions on the property, and the damages sustained as a result of the fire. Mr. Wauters was responsible for taking a monthly inventory of items on the construction lot, and he inspected the lot a couple of times per week. He testified that Gordon had stacks of foam insulation, about four feet wide and eight feet tall and long, which were stored approximately three to four feet from the fence. He noted that the insulation packaging included a warning that the product was combustible. Mr. Wauters described a slope of approximately four feet from the base of the fence to the flat yard of Gordon's property and acknowledged that it was feasible for Gordon to store the insulation 15 feet away from the fence. There were pine trees on the mulched strip of land between the Gordon and Steamfitters properties. Mr. Wauters testified that the wind blew pine needles 20 to 30 feet into Gordon's construction yard.

Bruce Berlin, Gordon's Chief Financial Officer, testified that, prior to the fire, he was not aware of any code provision that required the foam insulation to be stored a certain distance from the property line. He stated that the insulation was closer to the fence near the parked vehicles, but as the slope between the two properties became steeper, the insulation was stacked farther away from the fence. Mr. Berlin summarized the property damage incurred by Gordon as the result of the fire, which included the destruction of the structure, three destroyed vehicles and a tow trailer, damaged containers, loss of inventory, and the expense of the hazardous materials clean-up. He testified that Gordon's lot was not scraped or cleaned until sometime between June and October 2015, when a company

10

provided hazardous waste removal. The parties stipulated that Erie paid Gordon $1,039,176.67 for its property damage.

Erie's expert witness on fire investigations, Michael Schaal, testified as to the origin of the fire, as well as its cause, growth and spread. Mr. Schaal stated that, during his investigation, he observed "[h]undreds and hundreds, if not thousands of cigarettes" in the mulched area on Steamfitters' side of the fence. Although the mulch, pine needles, and cigarette butts were all combustible materials involved in the fire, Mr. Schaal stated that the most significant factor was the wind. On the day of the fire, the wind was blowing from the southeast across Gordon's lot and the fire burned in that direction. Mr. Schaal explained that fire does not burn against the wind. He testified that burning mulch, leaves, and pine needles could have been carried by the wind resulting in combustibles "further down the line" having been ignited. It was Mr. Schaal's opinion that the location of foam insulation on Gordon's property had no effect on the cause of the fire. He explained that due to the speed and direction of the wind, the foam insulation would have burned regardless of whether it was stored four feet or twenty feet from the fence. Mr. Schaal testified that the wind was blowing "20 or 22 knots" and the fire "spread across the parking lot very, very rapidly." By the time the fire department arrived, the fire "was well-involved."

Like Lieutenant Crosby, Mr. Schaal rejected the idea that the fire originated in a vehicle on Gordon's lot because if it had, the fire would have had to burn back against the wind to cause the damage that occurred on the ground level along the fence line. Based upon his review of the surveillance video from the church property, Mr. Schaal observed white smoke drift across the parking lot for 23 minutes and then the smoke instantly turned black.

11

He opined that the white smoke was caused by "the mulch and pine straw burning along the fence line" and that the heavy black smoke was caused by the burning of the insulation. Moreover, Mr. Schaal stated that he did not observe fire in the cab of any vehicle on Gordon's property, which would have been expected if the fire originated in a vehicle. Mr. Schaal also rejected the idea that the burn pattern along the base of the fence was caused by burning foam insulation and not burning mulch. He concluded that the fire spread from Steamfitters' side of the fence to Gordon's lot because the wind picked up embers and spread them to Gordon's lot or because the fire spread through the base of the chain-link fence. In either event, he opined that the fire originated on Steamfitters' side of the fence.

Several photographs of the mulched area taken after the fire were introduced into evidence. The photographs show hundreds of cigarette butts in the mulch bed in varying condition. Gordon and its insurers argued the inference that the butts had been deposited over a long period of time.

Steamfitters presented testimony from fire investigator, Richard Thomas Long, Jr., who was accepted as an expert in fire origin, cause, and spread. Mr. Long first visited the site of the fire on May 11, 2015, when he was invited to attend a joint-party investigation. Later in October 2015, he inspected the vehicles that were burned in the fire. As part of his investigation, Mr. Long reviewed aerial and historic images of the property, weather data, surveillance and cell phone videos, and the Prince George's County Code. Although Mr. Long hypothesized that the fire originated in the mulch on Steamfitters' side of the fence, he testified that mulch fires are "very low intensity fire[s]," that would not produce six-foot-tall flames. Mr. Long testified that the burn patterns along the fence and the

12

dumpster were too tall to have been caused by a mulch fire. He opined that the burn patterns on the fence were caused by the burning foam insulation that hit the fence and discolored it.

Mr. Long testified that there were no pine needles, mulch, or other "thick, porous debris" more than five to six feet into Gordon's lot, there was no evidence that the fire spread 15 feet into Gordon's property, and if the fire had come through the fence, it would have only spread five to six feet before encountering gravel, which "doesn't burn." According to Mr. Long, the "highly combustible" foam insulation was too close to the fence, which made it easier to ignite when the wind pushed the mulch fire through the fence.

On cross-examination, Mr. Long acknowledged that he had initially developed two possible theories about the cause of the fire. The first was that the foam insulation boards on Gordon's property were stored too close to the fence, and they ignited when the fire was pushed through the fence. The second theory was that the fire started in a vehicle that was parked on Gordon's lot. That theory was based, in part, on the testimony of Mr. Grasso, who, as previously noted, claimed that when he looked over the fence, he saw fire near the parked vehicles. Mr. Long acknowledged that if Mr. Grasso's testimony was determined to be incorrect, he would have to eliminate the vehicle as a possible cause of the fire. At Mr. Long's deposition, counsel for Gordon and its insurers pointed out that Mr. Grasso did not appear in any video looking over the fence, a fact that had escaped Mr. Long's notice. Thereafter, Mr. Long abandoned his second theory concerning a vehicle fire as a potential cause. At trial, Mr. Long acknowledged that he had given deposition testimony in which he rendered an opinion that the burn patterns on the base of the fence, where Lieutenant

13

Crosby and Mr. Schaal had placed the origin of the fire, were caused by melting foam insulation that pooled in that area. When asked how melting insulation flowed up hill, Mr. Long admitted that there was not really a change in elevation at that point.

As the Court of Special Appeals stated, "[t]he evidence relating to the storage of insulation was relevant to the defense of contributory negligence. The jury rejected that defense." *Steamfitters Local Union No. 602 v. Erie Ins. Exch.,* 241 Md. App. 94, 110 (2019).

Additional facts are included below as necessary to our discussion of the questions presented.

**II.**

**Proceedings Before the Court of Special Appeals**

After the jury returned verdicts in favor of the Plaintiffs, Steamfitters noted a timely appeal. The Court of Special Appeals affirmed the circuit court's judgment. With respect to the issue of whether Steamfitters owed a duty to its neighbors under the facts of this case, the court noted that "[n]o Maryland case has addressed the specific issue before us in the context of a fire caused by a condition that is not inherently dangerous but rather considered to be normal, absent extenuating circumstances." *Id*. at 116. Although it had no case with similar facts upon which it could rely, the Court of Special Appeals recognized that this Court "has determined that a property owner owes a common law duty of reasonable care to the owners and occupants of neighboring property when conducting activities on his or her property so as to avoid harm to the neighboring property." *Id*.

14

Applying established principles applicable to the duty of reasonable care owed by a property owner to his or her neighbor, the Court of Special Appeals concluded that Steamfitters owed its neighbors a duty under the specific facts of this case "because the otherwise normal condition became dangerous by virtue of the practice of persons tossing cigarette butts into the mulch." *Id.* at 120. The court found that "there was evidence from which the jury could determine that Steamfitters was aware that hundreds of cigarettes had been discarded in the mulch and that this practice put it on notice that a dangerous practice was occurring on its property, specifically the disposal of cigarettes in a combustible substance." *Id.* The court concluded that "[i]t was for the jury to resolve conflicts in the evidence presented and to determine whether Steamfitters breached its duty of care to neighboring property owners to avoid the likely spread of fire arising from a cigarette discarded in mulch." *Id.* at 121.

The Court of Special Appeals further held that expert testimony was not required to prove the existence of Steamfitters' duty, stating that "[t]he foreseeable risk of fire created by habitually discarding cigarettes in a combustible substance is a matter of common knowledge, well known to ordinary people. Likewise, the duty to exercise reasonable care to guard against the risk of fire was not so esoteric as to require expert testimony." *Id.* at 124. Accordingly, the intermediate appellate court affirmed the circuit court's denial of Steamfitters' motions for judgment based on the existence of the duty and that the evidence presented was sufficient for the jury to conclude that Steamfitters was aware that people on their property were regularly discarding cigarettes into combustible mulch. *Id.*

15

With respect to spoliation, the Court of Special Appeals held that the trial court did not abuse its discretion in giving the spoliation instruction. *Steamfitters*, 241 Md. App. at 128–33. Finally, the court affirmed the entry of summary judgment in favor of the Training Fund, holding that the terms of the Agreement did not require the Training Fund to indemnify Steamfitters for Steamfitters' own negligence. *Id.* at 136–37.[5]

As set forth below, we agree with the Court of Special Appeals' well-reasoned analysis and affirm its judgment.

## III.

## Discussion

We first consider Steamfitters' contention that it did not owe the neighboring properties a duty under the facts and circumstances of this case.

### *A Property Owner's Common Law Duty of Reasonable Care to Use Property in a Manner to Avoid Harm to the Neighboring Property*

Steamfitters contends that the circuit court erred in denying its motion for judgment because it owed no duty of care to Gordon and Falco because mulch is "not a dangerous condition" and because it had no duty to prevent third persons from smoking near its mulched common area. In its brief, Steamfitters asserts that the Court of Special Appeals

---

[5] In his dissenting opinion, Judge Friedman set forth four reasons why he disagreed with the Majority's holding that Steamfitters owed the neighboring property owners a duty of care, stating that: (1) the "[u]se of mulch in landscaping should not be the source of tort duty"; (2) the presence of old cigarette butts did not increase the risk of fire; (3) the Majority's opinion extends tort liability to landowners for actions of third parties over whom they have no control; and (4) if landowners put out more ashtrays and cleaned up mulched areas in the future, it will not avoid fires. *Steamfitters Local Union No. 602 v. Erie Ins. Exch.,* 241 Md. App. 94, 137–39 (2019). For the reasons set forth in this opinion, we disagree.

16

erroneously found a duty "based on foreseeability alone," and that it "never truly even defined" the duty. From there, Steamfitters argues that the Court of Special Appeals "extends premises liability further than anywhere else in the nation, imposing a duty that is at once both undefined and unlimited[,]" and therefore, "cannot be fulfilled."

The Respondents assert that neither the circuit court nor the Court of Special Appeals created a new tort, nor did the Court of Special Appeals or the trial court impose a duty in this case based upon foreseeability alone. Rather, Respondents argue that the courts simply applied the well-recognized principle that property owners owe a duty to occupants of neighboring land to use reasonable care when conducting activities on the land so as to avoid harm to the neighboring land. In the context of this case, Respondents contend that the Court of Special Appeals correctly determined that the common law duty of reasonable care owed by Steamfitters to its neighbors was the duty "to avoid the likely spread of fire arising from a cigarette discarded in mulch[,]" or put another way, the "duty to prevent cigarettes from being discarded in mulch and causing a fire." *Steamfitters*, 241 Md. App. at 121 (internal quotations omitted).

We review a trial court's decision to grant or deny a motion for judgment *de novo*. *Thomas v. Panco Mgmt. of Md., LLC*, 423 Md. 387, 393–94 (2011). In a civil trial, if, considering the evidence in a light "most favorable to the plaintiff, a reasonable finder of fact could find the essential elements of the cause of action by a preponderance of the evidence standard, the issue is for the jury to decide, and a motion for judgment should not be granted." *DeMuth v. Strong*, 205 Md. App. 521, 547 (2012) (citations omitted). An appellate court performs the same task as the trial court, affirming the denial of the motion

17

for judgment, "if there is 'any evidence, no matter how slight, that is legally sufficient to generate a jury question.'" *C & M Builders, LLC v. Strub*, 420 Md. 268, 291 (2011) (quoting *Tate v. Bd. of Educ.*, 155 Md. App. 536, 544–45 (2004)). In other words, "we will reverse the trial court's denial of a motion for judgment notwithstanding the verdict only if the facts and circumstances permit but a single inference as relates to the appellate issue presented." *Jones v. State*, 425 Md. 1, 31 (2012) (citations omitted).

In a negligence action, a plaintiff bears the burden of proving: "1) that the defendant was under a duty to protect the plaintiff from injury, 2) that the defendant breached that duty, 3) that the plaintiff suffered actual injury or loss, and 4) that the loss or injury proximately resulted from the defendant's breach of that duty." *Rowhouses, Inc. v. Smith*, 446 Md. 611, 631 (2016) (quoting *Hamilton v. Kirson*, 439 Md. 501, 523–24 (2014)). The determination of whether a duty exists is a legal conclusion that this Court reviews *de novo*. *Todd v. Mass Transit Admin.*, 373 Md. 149, 155 (2003) (citing *Valentine v. On Target, Inc.*, 353 Md. 544, 549 (1999)).

Here, we are focused on the first element—whether Steamfitters owed the neighboring property owners a duty to protect them from injury. In determining whether a duty exists in a particular context, this Court has often turned to W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* ("Keeton") § 53 (5th ed. 1984), which characterizes "duty" as "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *See, e.g., Blondell v. Littlepage*, 413 Md. 96, 120 (2010); *Gourdine v. Crews*, 405 Md. 722, 745 (2008); *Pendletown v. State*, 398 Md. 447, 461 (2007); *Doe v. Pharmacia & Upjohn Co.*, 388 Md.

18

407, 415 (2005); *Hemmings v. Pelham Wood LLLP*, 375 Md. 522, 536 (2003); *Todd v. Mass Transit Admin.*, 373 Md. 149, 155 (2003); *Ashburn v. Anne Arundel Cty.*, 306 Md. 617, 627 (1986). No universal test has ever been formulated for determining whether a duty exists. *Jacques v. First Nat. Bank of Md.*, 307 Md. 527, 533 (1986) (quoting Keeton, § 53, at 357–58). Rather, the requirements of a legal duty are dependent upon the specific facts and circumstances presented. *Village of Cross Keys, Inc. v. U.S. Gypsum Co.*, 315 Md. 741, 751–52 (1989) (quoting *W. Va. Central R. Co. v. Fuller*, 96 Md. 652, 666 (1903)). A tort "'duty' is . . . an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." *Jacques*, 307 Md. at 533 (quoting Keeton, § 53, at 358).

As we have repeated on numerous occasions, when determining whether a tort duty should be recognized, we consider, among other things, the following variables:

> [T]he foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and the consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.

*Asburn*, 306 Md. at 627 (quoting *Tarasoff v. Regents of Univ. of Cal.*, 551 P.2d 334, 342 (Cal. 1976)). Among these factors, foreseeability weighs the heaviest. *Kennedy Krieger Inst. v. Partlow*, 460 Md. 607, 634 (2018). In determining whether a duty exists, we consider foreseeability prospectively—taking into account the facts existing at the time of the negligent conduct. *Henley v. Prince George's Cty.*, 305 Md. 320, 336 (1986).

We disagree with Steamfitters' assertion that the Court of Special Appeals created a "new duty" to be imposed upon property owners. For at least the past 80 years, this Court has recognized that ownership, operation, and maintenance of property come with the common law duty to use reasonable care so as not to cause harm to the neighboring property owners. The duty recognized by this Court is not dependent upon the presence of a particular type of material, or the occurrence of a particular type of activity. Rather, a duty may arise when, viewing the totality of the circumstances, there exists a hazardous condition and the property owner was on notice of the hazardous condition. *See, e.g., La Belle Epoque, LLC v. Old Europe Antique Manor, LLC*, 406 Md. 194, 219 (2008) ("A person who negligently fails to make the condition reasonably safe can be liable for harm that the condition causes to neighboring premises." (citation omitted)); *Rosenblatt v. Exxon Co., U.S.A.*, 335 Md. 58, 76–77 (1994) ("[T]he occupier of land owes a duty to occupants of neighboring land to use care when conducting activities on the land so as to avoid causing harm to the neighboring land."); *Frenkil v. Johnson*, 175 Md. 592, 599 (1939) ("[O]ne must use his own rights and property so as to do no injury to those of others."); *Toy v. Atlantic Gulf & Pacific Co.*, 176 Md. 197, 213 (1939) (explaining that when a person elects to do or keep something on his or her property that exposes neighboring property to danger, that person has a duty to make the condition reasonably safe); *see also*, 1 Am. Jur. 2d *Adjoining Landowners* § 11 (2019) (noting that "[a] landowner has a duty to use one's property so as to not unnecessarily and negligently injure one's neighbor").

We first recognized this duty in *Frenkil v. Johnson*, 175 Md. 592 (1939). In that case, we considered the duty owed to a plaintiff who sustained injuries while seated in his vehicle

20

on a street when an explosion occurred in a nearby building that the defendants were

demolishing. Employees of the defendant reported the smell of gas in the building being

demolished and, after an investigation, the gas company removed some gas meters and

plugged some service pipes that entered the building. *Id.* at 598. Thereafter, the employees

continued to smell gas and reported the smell to their supervisor, but no further action was

taken to locate the source of the gas or otherwise remedy the situation. *Id.* After the

explosion, it was determined that the gas was not entering the building because of any defect

in the prior work by the gas company, but rather through a stone foundation wall. *Id.*

In discussing the tort liability of the defendant, who was occupying the premises for

the purpose of demolishing the building, we recognized the general principle of law that,

within certain limitations, "one must use his own rights and property so as to do no injury

to those of others." *Id.* 599. With respect to the dangerous condition, such as the escape

of gas, we explained that:

> the occupier is not liable until he knew, or in the exercise of
> reasonable prudence and diligence, should have known, of the
> altered and dangerous condition, and continues it after such
> knowledge is so acquired or imputed.
>
> Hence, after the occupier or possessor knows or should know
> of the danger of the artificial condition of the premises to others
> outside the land, and fails to exercise reasonable care and
> diligence to make the condition reasonably safe either by
> removing the danger or by giving adequate warning or by using
> other effective safeguards, the occupant or possessor becomes
> liable to persons outside the land for injuries which are the
> proximate result of such artificial conditions.

*Id.* at 600 (citations omitted). We determined that the "perils of explosion and fire" from

the accumulation of gas in the building being demolished "were obvious and known to the

21

defendant for such a length of time as to make it a question for the jury whether the defendant, after he knew of the dangerous condition . . . failed to use reasonable care and diligence to prevent injuries by explosion to travelers upon the adjoining public streets." *Id.* at 601.

In *La Belle Epoque, LLC v. Old Europe Antique Manor, LLC*, 406 Md. 194 (2008), we considered a property owner's duty after a third-party tenant placed garbage and debris in a common area that blocked a culvert, which caused snow and rain to back up into another tenant's space, resulting in property damage. We reversed the trial court's entry of summary judgment in favor of the property owner and held that the property owner "would be liable for its own negligence for injury caused to others resulting from the placement of debris in the alley, whether or not the alley is considered a common area." *Id.* at 218 (citing *Frenkil*, 175 Md. at 599). We explained that "[a] person who negligently fails to make the condition reasonably safe can be liable for harm that the condition causes to the neighboring premises." *Id.* at 219. In other words, we imposed a duty of reasonable care on the property owner for its own conduct in allowing a hazardous condition created by a third party to continue after learning of its existence. We observed that "a reasonable trier of fact could conclude that the pile of trash and debris that [the property owner] allegedly allowed to accumulate in the alley constituted a dangerous condition on the premises and that [the property owner] failed to remove the debris or protect others from that condition." *Id.*

Our jurisprudence is consistent with the general principles of tort law espoused by Keeton concerning duties owed by property owners to their neighbors. Keeton notes that "[t]he possessor of land is first of all required to exercise reasonable care, with regard to

22

any activities which he carries on, for the protection of those outside of his premises." Keeton, *supra*, § 57, at 387. Keeton points out that "one important limitation upon the responsibility of the possessor of land to those outside of his premises has been the traditional rule . . . that he is under no affirmative duty to remedy conditions of purely natural origin upon his land, although they may be highly dangerous or inconvenient to his neighbors." *Id.* at 390. On the other hand, if the occupant has "altered the condition of the premises . . . the condition is no longer to be regarded as a natural one, and he will be held liable for the damage resulting from any negligence." *Id.* at 390–91.

As the Court of Special Appeals observed, although no Maryland case discusses a property owner's duty of care in the context of fire spread under conditions similar to the facts of this case, courts in other jurisdictions and treatises have recognized that a property owner has a duty of reasonable care to maintain his or her property in a manner so as not to allow fire to ignite and spread to neighboring properties. *Steamfitters*, 241 Md. App. at 119–21 (discussing *Scully v. Fitzgerald*, 843 A.2d 1110 (N.J. 2004) and *Hesse v. Century Home Components, Inc.,* 514 P.2d 871, 872–74 (Or. 1973)). *See also Dealers Serv. & Supply Co. v. St. Louis Nat'l Stockyards Co.*, 508 N.E.2d 1241, 1244–45 (Ill. App. Ct. 1987) (holding that a property owner had a duty to use and maintain its property in a manner so as not to create an unreasonable risk of fire spreading to adjoining property); *Custom Craft Tile v. Engineered Lubricants Co.*, 664 S.W.2d 556, 558 (Mo. Ct. App. 1983) (holding that a property owner had a duty not only to use reasonable care in preventing the outbreak of fire, but also to guard against the risk of fire spreading to neighboring properties); *Empire State Bldg. Co. v. Bryde*, 318 N.W.2d 65, 68 (Neb. 1982) ("'[W]here

23

one negligently stores combustible material on his property in such a way that it is reasonably foreseeable that fires will start thereon and spread to the property of another, he may be held liable for damage caused when this occurs, although the fire starts accidentally[.]'" (quoting 35 Am. Jur. 2d *Fires* § 27 (1967))).

In *Scully*, the Supreme Court of New Jersey found a property owner liable for property damage arising from a carelessly discarded cigarette by an unknown person. *Scully* involved two separate rental properties that were adjacent to each other and were owned by the same landlord. In the area where the fire started, the landlord stored combustible materials. The plaintiff commercial tenant sued his landlord alleging that the landlord breached his duty to maintain his neighboring apartment complex in a reasonably safe condition so as not to endanger the property of others. *Scully*, 843 A.2d at 1112–14. The plaintiff presented evidence that in the area where the fire started, the defendant stored lawn mowers, gasoline, mulch, old papers, refuse, construction debris, and garbage both in and out of trash cans. *Id.* at 1113. The storage area was freely accessible to others, and the tenants regularly smoked cigarettes on the deck above the storage area, discarding their cigarette butts into the area. *Id.* Fire officials investigating the blaze found cigarette butts in the general area. *Id.*

After the trial court granted summary judgment in favor the landlord on the basis that the plaintiff failed to prove a duty, the New Jersey Supreme Court reversed. The court recognized the "simple proposition" that a property owner will be liable if he "takes inadequate precautions to guard against the risk of fire when it is reasonably foreseeable that an errant spark from a trespasser's or stranger's discarded match or cigarette will ignite

24

a blaze that will spread and engulf neighboring properties." *Id.* at 1117. The court held that the duty to act reasonably arose from the combined presence of flammable materials and the knowledge that people were carelessly discarding cigarettes in the vicinity of the flammable materials. *Id.* The court determined that "in view of the surrounding circumstances, . . . 'a person of ordinary experience and intelligence would have foreseen'" that a fire could have been caused by the tenants' actions in "routinely discard[ing] cigarettes within the immediate vicinity of the flammable materials." *Id.* (citation omitted). Accordingly, the court held that under the circumstances, the defendant owed a common law duty to "guard against the risks associated with the start or spread of a fire by the negligent or intentional act of a third party . . . ." *Id.*

Applying the general principles of a property owner's duty of reasonable care espoused by this Court in *La Belle Epoque* and *Frenkil*, and which have been similarly applied by other courts, we hold that under the specific facts and circumstances presented in this case, Steamfitters owed its neighbors a common law duty to maintain its property in a manner that would not cause an unreasonable risk of the spread of fire to the neighboring properties. We agree with the Court of Special Appeals that although Steamfitters used its property, including the mulch strip, in a normal or ordinary manner, "there was evidence from which the jury could determine that Steamfitters was aware that hundreds of cigarettes had been discarded in the mulch and that this practice put it on notice that a dangerous practice was occurring on its property, specifically the disposal of cigarettes in a combustible substance." *Steamfitters*, 241 Md. at 120.

25

The Plaintiffs presented evidence at trial that Steamfitters created the mulched area immediately adjacent to Gordon's property and permitted individuals to linger in the common areas of its property for hours while passing time prior to the commencement of their mandatory training. There was evidence from which a jury could determine that union officials, Mr. Loveless and Mr. Mastripolito, knew or should have known that individuals were carelessly discarding hundreds of cigarette butts in the mulch because they both walked through that area on several occasions in the weeks before the fire. Steamfitters' business manager, Mr. Loveless, acknowledged that there were more butts "than there should have been" and that discarding cigarette butts in mulch presents a risk of fire. Despite this knowledge, Steamfitters took no action to prevent the foreseeable risk that a fire might start on its property as a result of individuals' careless acts of habitually discarding cigarette butts in the mulch.[6]

Steamfitters asserts that this case is distinguishable from other premises liability cases because mulch is not a "dangerous condition." Of course, we agree that simply keeping mulch on one's property is not considered to be a "dangerous" condition or activity. However, an otherwise natural or normal condition can become dangerous when one adds human activity into the mix. For example, the presence of surface water is a

_____

[6] Steamfitters also relies upon *Patton v. United States Rugby Football, Union, Ltd.*, 381 Md. 627 (2004), and argues that it could not be liable because it had no duty to control the conduct of third parties. Steamfitters' reliance on *Patton* and principles associated with third-party control, have no application here. As the trial court and Court of Special Appeals correctly noted, the Respondents' claims were not based upon a theory of vicarious liability. Instead, the negligence claims were based upon Steamfitters' *own negligence* and the duty owed to neighboring property owners, which this Court has recognized for decades.

natural condition that does not create tort liability on its own. However, if a property owner artificially increases or concentrates the natural flow of surface water over his or her property in a manner that causes damage to a neighboring property, the property owner may be liable for damages caused by the altered flow. *See, e.g.*, *Battisto v. Perkins*, 210 Md. 542, 546 (1956) (holding that where a property owner removed all ground cover, thereby increasing the runoff and causing damage to the adjacent property owner, the property owner had a "duty to use reasonable precautions against harm" sustained by the neighbor and that "[w]hat would be reasonable is ordinarily a question for the jury").

This case is not simply about the presence of mulch. We agree with the Court of Special Appeals that a duty arose because the otherwise normal condition—the placement of mulch—"became dangerous by virtue of the practice of persons tossing cigarette butts into the mulch." *Steamfitters*, 241 Md. App. at 120. It is the confluence of factors in this case that leads us to conclude that Steamfitters owed its neighbors a duty to take reasonable steps to remove the danger. Steamfitters knew that the individuals congregated for hours in the common area prior to class and that those individuals smoked and discarded their cigarette butts during that time. Given the hundreds of cigarette butts that were discarded in the mulch strip, a jury could determine that Steamfitters knew or should have known that individuals were habitually discarding cigarettes in mulch. It is within common knowledge that discarding cigarettes in combustible material such as mulch could start a fire—and it is certainly a foreseeable consequence of allowing or enabling the constant littering or disposal of cigarettes along a common boundary between commercial properties.

27

Like the Court of Special Appeals, we "emphasize that this conclusion rests on the evidence from which a jury could find that a large number of cigarette butts were discarded in the mulch over a long period of time prior to the fire." *Id.* at 121. This is not a situation where only a few errant butts were found in the area, or where there was no evidence from which a jury could conclude that the property owner had actual or constructive knowledge of the hundreds, if not thousands, of cigarette butts located in a combustible material located adjacent to the neighboring property. Under the totality of the facts presented in this case, "[i]t was for the jury to resolve conflicts in the evidence presented and to determine whether Steamfitters breached its duty of care to neighboring property owners to avoid the likely spread of fire arising from a cigarette discarded in mulch." *Id.*

We hold that, under the facts of this case, Steamfitters had a duty to exercise reasonable care to maintain its property in a manner that would not cause an unreasonable risk of the spread of fire from cigarette butts habitually discarded in combustible material. Accordingly, we agree with the Court of Special Appeals that the trial court did not err in denying Steamfitters' motion for judgment and permitting the jury to resolve the negligence claim.

### *Is Expert Testimony Required for the Jury to Understand the Fire Hazards Associated with Habitually Discarding Cigarettes in Mulch?*

Steamfitters contends that the circuit court erred in denying its motion for judgment because the Plaintiffs did not present expert testimony, which it asserts was required to establish the standard of care and reasonable steps that commercial landowners must take to prevent people on their premises from discarding cigarettes in flammable mulch.

28

Steamfitters suggests that the property owner's standard of care in this case is beyond the understanding of an average person because compliance potentially requires the "demolition and/or construction of[] commercial property" and, therefore, an understanding of engineering and building codes.

The Respondents argue, conversely, that ordinary people of average intelligence understand the risk of fire presented in this case, as well as what reasonable steps Steamfitters could have taken to mitigate that risk. They suggest that the jury could use its common knowledge and experience to determine how Steamfitters could satisfy its duty to its neighbors and that this did not require any expertise.

We generally review a trial court's decision to admit or deny evidence for abuse of discretion. *Johnson v. State*, 457 Md. 513, 530 (2018) (citing *Hopkins v. State*, 352 Md. 146, 158 (1998)). In deciding whether a trial court abused its discretion we will uphold the court's findings of fact unless they are clearly erroneous but will afford no deference to the court's conclusions of law. *Brooks v. State*, 439 Md. 698, 708 (2014) (citations omitted).

Expert testimony is generally admissible when it would be useful to the factfinder in understanding evidence or determining a fact in issue. *See* Md. Rule 5-702. However, "[e]xpert testimony is *required* 'only when the subject of the inference [to be drawn by the jury] is so particularly related to some science or profession that it is beyond the ken of the average layman . . . .'" *Johnson*, 457 Md. at 530 (quoting *Bean v. Dep't of Health & Mental Hygiene*, 406 Md. 419, 432 (2008) (citations omitted)) (emphasis in original). Expert testimony is *not* required for matters that would be within the common knowledge of an average person. *Id.*

Like the analysis of the New Jersey Supreme Court in *Scully*, and of the Court of Special Appeals in this case, we agree that the issues in dispute here fell within the common knowledge of jurors. As the court explained in *Scully*,

> Certain dangerous conditions that create the foreseeable risk of fire are well known to ordinary people and are a matter of common knowledge. A jury does not need a fire expert to explain to it the dangers that might follow when a lit cigarette is thrown into a pile of papers or other flammable material. . . . It is within the province of the jury ultimately to determine whether [the] defendant breached that duty.

843 A.2d at 1118 (citation omitted). We agree with the Court of Special Appeals that "the same result is warranted in the instant case." *Steamfitters*, 241 Md. at 124. Here, the Plaintiffs did not allege that Steamfitters violated a duty established by a building code or civil engineering standard. Rather, the Plaintiffs asserted that Steamfitters "owed a common law duty to maintain its property in a reasonably safe manner so as to prevent harm to neighboring properties." *Id*. "The foreseeable risk of fire created by habitually discarding cigarettes in a combustible substance is a matter of common knowledge, well known to ordinary people." *Id*. Indeed, most individuals who have watched a public service announcement by Smokey Bear, see note 1, *supra*, are aware of the fire hazards associated with discarding cigarette butts in flammable materials.

Similarly, "the duty to exercise reasonable care to guard against the risk of fire was not so esoteric as to require expert testimony." *Id*. The jury was free to use their common knowledge and experience to consider how this fire could have been prevented, such as implementing a no-smoking policy on the property, removing the mulch, creating a designated smoking area in another location on the property where the ground material did

30

not consist of combustible materials, or any number of reasonable options in light of the activity that Steamfitters knew, or should have known, was habitually transpiring on its property. It was within the jury's province to apply its common knowledge and experience to determine what constituted reasonable care to guard against the risk of fire and whether Steamfitters breached that duty.

### *Spoliation Instruction*

Steamfitters also argues that the trial court abused its discretion in giving the jury the standard spoliation instruction that addressed both negligent and intentional spoliation of evidence. This instruction pertained to a video recording from a surveillance camera on Steamfitters' building that was pointed close to the area where the fire was alleged to have originated. Steamfitters failed to produce the video during discovery, and it was undisputed that the video was taped over and destroyed 30 days later. There was evidence at trial that on separate occasions, Lieutenant Crosby and Erie's claims adjuster, Dustin Sclater, asked for the video before it was destroyed. Respondents sent a litigation hold letter on April 23, 2015, to which counsel for Steamfitters responded, prior to the destruction of the tape.

Steamfitters asserts that the circuit court's spoliation instruction was erroneously given because the Respondent failed to prove that the video was relevant and because the instruction was unfairly prejudicial. Steamfitters maintains that an insurance claims adjuster employed by Erie reviewed the tape, advised that it was "useless" and declined a copy on a thumb drive prior to the destruction of the recording. They argue that the spoliation instruction was improper because the taped-over footage was not relevant evidence.

31

The Respondents argue that this is a gross mischaracterization of the evidence. They assert that the video contained highly-relevant evidence that would have supported their theory of the case—footage of union apprentices smoking cigarettes on Steamfitters' property, near the place where the fire must have started. Moreover, the Respondents argue that Steamfitters cannot challenge the portion of the instruction pertaining to intentional spoliation because they failed to object on those grounds at trial and instead, only made a general relevance objection.

This Court reviews a trial court's grant or denial of a requested jury instruction for abuse of discretion. *Keller v. Serio*, 437 Md. 277, 283 (2014) (citing *Stabb v. State*, 423 Md. 454, 465 (2011)). When applying the abuse of discretion standard in this context, we look to the following factors: "(1) whether the requested instruction was a correct statement of the law; (2) whether it was applicable under the facts of the case; and (3) whether it was fairly covered in the instructions actually given." *Id.* (citations omitted) (internal quotations omitted). Steamfitters focuses on the second factor. For the reasons set forth below, we agree with the Court of Special Appeals that the circuit court did not abuse its discretion in giving the instruction.

*1. Evidence Pertaining to the Steamfitters' Video Recording*

As described above, the Fire Marshal's Office attempted to obtain videos from building-mounted cameras and cell phones as part of its investigation. At trial, Lieutenant Crosby testified that he identified three surveillance cameras in the vicinity of the fire. One camera was mounted on Falco's building, one was on a church across the street from the fire, and the third was on Steamfitters' building. The Fire Marshal's office requested and

32

received the video footage from Falco and the church, but no recording was provided by Steamfitters.

Concerning attempts made by the Fire Marshal's office to obtain the surveillance video coverage from Steamfitters, Lieutenant Crosby testified as follows:

> Q. [Counsel for Erie:] And were there efforts made to obtain those videos?
>
> A. [Lieutenant Crosby:] Yes.
>
> Q. And when did your office attempt to secure those videos in terms of timing? From the date of the fire, how many days out were those requests made?
>
> A. Well, we know that videos are time sensitive as far as security goes. Most of them that have seven days, most of them have 30 days, so we try to do it within that seven-day period. I'm not sure exactly which day Investigator Murray and Investigator Wells went and obtained those videos, but we did get the information from who could provide those videos from Fal[c]o and the church from across the street.
>
> Q. And did your office request copies of any security videos from Steamfitters?
>
> A. Yes.
>
> Q. Did you ever receive them?
>
> A. No.
>
> Q. Do you know when that request was made?
>
> A. I don't know the exact date when it was made because, like I said, we had people assigned to different portions of the investigation. And Fire Investigator Murray and Captain Wells were assigned to get the video. I'm not sure what day they went.

33

Erie's claims adjuster, Dustin Sclater, testified that at some point after the fire, he went to Steamfitters' building to meet with certain individuals in an attempt "to get some information regarding the cause of the fire." Mr. Sclater could not recall with whom he met, but he understood that person to be an employee of Steamfitters. As he entered the building, Mr. Sclater noticed a security monitor pointed toward Gordon's property and took a photograph of it. Although Mr. Sclater could not recall if he asked for a copy of the surveillance video from the day of the fire, he testified, "I'm sure I would have asked for a copy" and that he "probably would have asked" for one.

There was conflicting testimony about who was present, as well as the discussions that took place between Steamfitters' corporate representative, John Mastripolito, and Mr. Sclater during this time period shortly after the fire. Mr. Mastripolito testified that at some unspecified time, he met with Mr. Sclater, who had come to Steamfitters' building to look at the video surveillance equipment. He testified that "there was [sic] two lieutenants. I don't know who the other one was." He believed that the lieutenants were from the fire department and that they viewed the surveillance footage with Mr. Sclater. Mr. Mastripolito testified that he told Mr. Sclater and the other individuals present that they were free to take a copy of the video recording and that he offered them a thumb drive, but they declined. On cross-examination, Mr. Mastripolito indicated that the individuals who he claimed told him that "the film didn't show anything" and "was useless" were the unidentified investigators from the Fire Marshal's office, not Mr. Sclater. Mr. Mastripolito could not recall if Mr. Sclater told him that the recording was of no use to him, but he stated

34

that Mr. Sclater did not disagree with the statements made by the lieutenants nor did he ask that the video recording be preserved.

Mr. Sclater disagreed with Mr. Mastripolito's version of events. Mr. Sclater testified that when he went to Steamfitters' building, the only person with him was his supervisor from Erie. He stated that they met with a woman and a man, not Mr. Mastripolito. He denied being present with any investigators from the Fire Marshal's Office. Mr. Sclater could not rebut the claim that "they" (the investigators from the Fire Marshal's Office) said the tape was "useless" because he denied being present at the union hall with the Fire Marshal's investigators when that statement was allegedly made.

The parties do not dispute that counsel for Erie sent a letter, dated April 23, 2015, less than three weeks after the fire, to Steamfitters' legal department that stated in part:

> Please accept this letter as a request that you place a litigation hold on any documents, data or other forms of media that identify who was present on your property on the date of the fire. We would also the [sic] like the identity of any employees, apprentices or union members who may have been smoking near the fence separating your property and Gordon Construction's property.

It is also undisputed that Steamfitters failed to preserve or produce the video recording taken from the date of the fire. In his deposition, which was read to the jury, Steamfitters' corporate designee, Daniel Loveless stated:

> We were asked by our attorney to provide some footage of the -- from the security cameras that we have, and we were able to determine that we couldn't go back that far. I think our video stored 30 days, or whatever. And when we were asked, it was more than 30 days past the date of the fire, so we were unable to retrieve any of that.

35

## 2. Spoliation Instruction Given to the Jury

At the close of all the evidence, the trial court instructed the jury on the issue of spoliation,[7] as follows:

> The destruction of or the failure to preserve evidence by a party may give rise to an inference unfavorable to that party . . . . If you find that the intent was to conceal the evidence, the destruction of -- the destruction or failure to preserve evidence may be inferred to indicate that the party believes that his or her case is weak and that he or she would not prevail if the evidence was preserved.
>
> Now, in this regard, the spoliation of the evidence, it has to do with film that Steamfitters Union have, if they take pictures of their property, and whether they spoliated that evidence or spoiled that evidence by taping over the film.
>
> The lawyers will argue about that, and they will explain it better than probably I have. But in any event, if you find that the destruction or failure to preserve the evidence was negligent, you may, but are not required to, infer that the evidence, if preserved, would have been unfavorable to the parties.
>
> So it's up to you to find out whether -- or make a determination as to whether that indicated that their case was weak or whether it indicated that they thought that it would be unfavorable to them in some respect.

---

[7] The instruction given by the court was based on Maryland Civil Pattern Jury Instruction 1:16, which provides:

> The destruction of or the failure to preserve evidence by a party may give rise to an inference unfavorable to that party. If you find that the intent was to conceal the evidence, the destruction or failure to preserve must be inferred to indicate that the party believes that his or her case is weak and that he or she would not prevail if the evidence was preserved. If you find that the destruction or failure to preserve the evidence was negligent, you may, but are not required to, infer that the evidence, if preserved, would have been unfavorable to that party.

After the jury was instructed, Steamfitters' counsel objected to the instruction on the ground that there was no factual predicate to support it. He pointed to Mr. Loveless's testimony to support Steamfitters' position that the video recording had been taped over prior to receiving the litigation hold letter. Steamfitters' counsel also argued that the requested video recording did not show the area where the fire was alleged to have originated and that the video recording was not relevant. In response, counsel for the Plaintiffs argued that the video recording would have shown an area "unbelievably close" to where the fire was alleged to have originated and might have shown what people were doing in the parking lot. Steamfitters' counsel countered that "this video might have showed people congregating here, it might have also been completely irrelevant, which is what Mr. Sclater told my folks. So why preserve it anyway? They haven't made a showing that there would be any reasons to ever preserve this video." The court rejected Steamfitters' argument and overruled its objection.

### 3. The Trial Court Did Not Abuse Its Discretion in Giving the Spoliation Instruction

We agree with the Court of Special Appeals that Steamfitters' relevance argument is without merit. There was evidence in the record that the camera was pointed in a direction that would have captured persons present on Steamfitters' property prior to and at the time of the fire, as well as a portion of the property close to the origin of the fire. Video of that area may have captured other evidence similar to the evidence captured by the other video cameras, which were shown to the jury, such as the color of the smoke, wind direction, and speed.

37

As noted in *Anderson v. Litezenburg*, it is for the jury to determine whether the destruction of evidence was merely the product of mistake, or whether the alleged spoliator intentionally destroyed the evidence. 115 Md. App. 549, 561 (1997) (quoting *Miller v. Montgomery Cty.*, 64 Md. App. 202, 214–15 (1985)). As the Court of Special Appeals correctly observed, the evidence was subject to different interpretations as to why Steamfitters did not preserve the video recording. *Steamfitters*, 241 Md. App. at 131. It was for the jury to consider Steamfitters' explanation of why it failed to preserve this evidence, to judge the credibility of the witnesses, and to draw inferences therefrom. The circuit court did not abuse its discretion in giving the spoliation instruction.

Lastly, Steamfitters argues that the circuit court abused its discretion in giving the portion of the spoliation instruction related to intentional spoliation, contending that there was no evidence that the video recording was intentionally destroyed. The Respondents counter that this issue was not properly preserved for consideration on appeal because Steamfitters failed to object to that specific portion of the jury instruction. Like the Court of Special Appeals, we agree.

Maryland Rule 2-520(e) provides that "[n]o party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection." This rule requires an objecting party to "be precise in stating objections to jury instructions at trial, for the plain reason that the trial court has no opportunity to correct or amplify the instructions for the benefit of the jury if the judge is not informed of the exact nature and grounds of the objection." *Fearnow v. Chesapeake &*

38

*Potomac Tel. Co. of Md.*, 342 Md. 363, 378 (1996) (citations omitted). We agree with the Court of Special Appeals that, because Steamfitters did not specifically raise with the trial judge the issue of the instruction's reference to intentional spoliation, the issue is not preserved on appeal.[8]

### *Propriety of Entry of Summary Judgment on Contractual Indemnification*

Lastly, Steamfitters argues that the circuit court erred in granting summary judgment to the Training Fund because genuine issues of material fact existed as to the indemnification clause of the Training Fund's use agreement. Steamfitters asserts that it bargained for indemnity against the negligence of third persons on its premises for classes conducted by the Training Fund, and that negligent cigarette disposal by one of the Training Fund's students falls within the indemnity provision.

A circuit court may grant a motion for summary judgment if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Md. Rule 2-501(f). This Court reviews a grant of summary judgment *de novo*, examining the record independently to determine whether any factual disputes exist when viewed in the light most favorable to the non-moving party and in deciding whether the moving party is entitled to judgment as a matter of law. *Rowhouses, Inc. v. Smith*, 446 Md. 611, 630 (2016) (quoting *Hamilton v. Kirson*, 439 Md. 501, 522 (2014)) (quotations omitted). This Court limits its review to the grounds relied upon by the trial court. *Hamilton*, 439 Md. at

---

[8] Even if the Steamfitters had preserved this contention, we agree with the Court of Special Appeals that it is for the jury to determine whether the destruction of evidence is the product of mistake or is intentional. *Steamfitters*, 241 Md. App. at 179 (citing *Anderson v. Litezenburg*, 115 Md. App. 549, 560–61 (1997)).

523. The interpretation of a contract is a question of law, which we also review *de novo*. *Questar Builders, Inc. v. CB Flooring, LLC*, 410 Md. 241, 262 (2009) (citation omitted).

In its third-party complaint against the Training Fund, Steamfitters sought indemnification pursuant to the Agreement, and alternatively, common law indemnification or contribution, in the event that it was held liable to the Plaintiffs for claims related to the fire. The Agreement, titled "Agreement for Use of Space," was entered into between Steamfitters and the Training Fund, and permitted the Training Fund to use four classrooms within the union hall, together with a non-exclusive right to use the common areas of the building (along with other tenants of the building), and the right to use a portion of the parking lot as designated by Steamfitters. The Agreement provided for a term of five years, commencing on January 1, 2009 and expiring on December 31, 2014. The Agreement required Steamfitters to insure the building against loss or damage and the Training Fund to maintain insurance on the value of its personal property located within the premises. The Agreement contained the following indemnity provision:

> (d) Indemnity. Training Fund hereby agrees to indemnify, hold the Union harmless and defend the Union from and against any cost, damage, action, claim, liability or expense (including attorney's and other professional fees) incurred by or claimed against the Union, directly or indirectly, as a result of or in any way arising from Training Fund's use and occupancy of the Premises or any part thereof or out of any parking areas, sidewalks, or other amenities in the vicinity of the Premises, or in any other manner which relates to the business of the Training Fund.

As noted above, the Agreement, by its express terms, expired months prior to the fire. It was undisputed that the Training Fund continued to use the classrooms until May

40

27, 2015, and that it did not make any payments for the use of the premises after the Agreement expired on December 31, 2014.

The Training Fund filed a motion for summary judgment as to Steamfitters' complaint for contractual indemnification. It argued, *inter alia*, that the Agreement expired more than four months prior to the fire and that there was no provision to extend that Agreement beyond December 31, 2014. The Training Fund also argued that even if the Agreement had not expired, the fire did not arise from the Training Fund's operation of classes or a student's use of the parking lot; rather, it arose from Steamfitters' use of the property.

Steamfitters opposed the summary judgment motion, arguing that it was entitled to indemnification under the Agreement because the Plaintiff's allegations that "apprentices waiting for Training Fund's classes to commence started the fire[,]" related directly or indirectly to the Training Fund's use and occupancy of the premises and the business of the Training Fund. Steamfitters also argued that it was entitled to common law indemnity and/or contribution because the Training Fund had a duty to police apprentices prior to the start of classes.

At a motions hearing, counsel for Steamfitters abandoned its claim for common law indemnification and contribution and limited its claim to contractual indemnity. After additional briefing and arguments, the trial court granted summary judgment in favor of the Training Fund. The Court recognized that the Plaintiffs' claims were premised on Steamfitters' failure to make the premises reasonably safe, i.e., its own negligence. The court reasoned that the claims were premised on an unknown person discarding a cigarette

41

in the mulch, not necessarily an apprentice. In entering summary judgment, the court found that: (1) under the indemnity provision in the Agreement, the Training Fund did not specifically agree to indemnify Steamfitters for Steamfitters' *own* negligence; (2) the Agreement containing the indemnity provision had expired months prior to the fire; and (3) the Plaintiffs' claims against Steamfitters did not arise out of the Training Fund's use of the premises, but out of Steamfitters' own use and operation of the premises.

We agree with the Court of Special Appeals that the circuit court did not err in granting summary judgment in favor of the Training Fund. By its plain terms, the indemnity provision applies only to claims that arise from the Training Fund's "use and occupancy" of the property or that "relate[] to the business of the Training Fund." The Plaintiffs' claims against Steamfitters did not arise out of the Training Fund's use and occupancy of the premises and did not relate to the Training Fund's business. Instead, the Plaintiffs' claims arose out of and related to Steamfitters' own negligent use and operation of the property. As noted by the Court of Special Appeals, it is well-established that a contract cannot be construed to indemnify a party against its own negligence unless the contract expressly or unequivocally states that this is the parties' intent. *Bd. of Trustees, Cmty. Coll. of Baltimore Cty. v. Patient First Corp.*, 444 Md. 452, 465 (2015). We will not interpret an agreement to indemnify a party against its own negligence absent express language or other "unequivocal terms." *Id.* at 465 (quoting *Crockett v. Crothers*, 264 Md. 222, 227 (1972)); *see also Mass Transit Admin. v. CSX Transp., Inc.*, 349 Md. 299, 309–10 (1998) ("Consequently, we require that there be no ambiguity and that the indemnification, if intended to embrace the sole negligence of the indemnitee, be

42

unequivocal."). We construe the language of an indemnification provision in accordance with its customary, ordinary, and accepted meaning. *See Atl. Contracting & Material Co. v. Ulico Cas. Co.*, 380 Md. 285, 300–01 (2004) (citations omitted).

Under the plain language of the indemnification provision, the Training Fund did not agree to indemnify Steamfitters for its own negligence. Accordingly, the trial court properly granted summary judgment in favor of the Training Fund. We will not address the additional reasons given by the trial court in light of our holding.

## IV.

## Conclusion

For at least the past 80 years, this Court has recognized that ownership, operation, and maintenance of property comes with a common law duty to use reasonable care so as not to cause harm to the neighboring property owners. A duty may arise when, viewing the totality of the circumstances, there exists a dangerous or hazardous condition on the property and the property owner was on notice of the dangerous or hazardous condition. We hold that under the specific facts and circumstances presented in this case, Steamfitters owed its neighbors a common law duty to maintain its property in a manner that would not cause an unreasonable risk of the spread of fire to the neighboring properties. Under the facts presented, there was evidence from which a jury could determine that Steamfitters had actual or constructive knowledge that hundreds of cigarettes had been discarded in the mulched common area along the property line, which created a foreseeable risk of fire spread to the neighboring properties. It was for a jury to resolve conflicts in the evidence presented in this

43

case and to determine whether Steamfitters breached its duty of care to neighboring property owners to avoid the likely spread of fire arising from a cigarette discarded in mulch.

We hold that expert testimony was not required to prove the applicable duty of care and to establish the reasonable steps a commercial landowner must take to fulfill its duty to prevent cigarettes from being regularly discarded in mulched common areas and causing a fire. Preventative steps that could have been taken are not outside the ken of the average layperson. Jurors were free to use their common knowledge and experience to consider reasonable steps that could have been taken to prevent a fire. Similarly, the foreseeable risk of fire created by habitually discarding cigarettes in a combustible substance is a matter of common knowledge, well known to ordinary people.

We hold the trial court did not abuse its discretion when it instructed the jury on spoliation of the evidence under the facts presented in this case.

The trial court did not err in granting summary judgment in favor of the Training Fund on the third-party complaint for contractual indemnification. Under the plain language of the indemnification provision, the Training Fund did not agree to indemnify Steamfitters for Steamfitters' own negligence.

The judgment of the Court of Special Appeals is affirmed.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**

44